Ronald John SMITH, et al., Plaintiffs,

v.

HUGHES AIRCRAFT COMPANY CORPORATION, Defendant.

All Consolidated Cases.

No. CIV 88–406–TUC–WDB.

United States District Court, D. Arizona.

Sept. 6, 1991.

John W. McDonald, Chandler Tullar Udall & Redhair, Tucson, Ariz., John R. Tomlinson, Lane Powell Spears Lubersky, Seattle, Wash., for plaintiffs Smith, Nat. Union Farm, John Gale, Phillip Freeman and Am. Home Ins.

Thomas M. Murphy, Murphy Goering Roberts & Holt, P.C., Tucson, Ariz., Thomas F. Connell, Wilmer Cutler & Pickering, Washington, D.C., for Ins. Co. of North America.

William H. Doyle, Doyle & Malinske, Phoenix, Ariz., Jeffrey A. Siderius, Hinshaw Culbertson Moelmann Hoban & Fuller, Chicago, Ill., for Argonaut Ins.

Bruce A. Featherstone, Kirkland & Ellis, Denver, Colo., Janet C. Bostwick, Molloy Jones & Donahue, P.C., Tucson, Ariz., for Hughes.

Stephen G. Schrey, Crosby Heafey Roach & May, Oakland, Cal., Steven D. Copple, Copple Chamberlin & Boehm, P.C., Phoenix, Ariz., for Hartford Acc.

## ORDER

WILLIAM D. BROWNING, Chief Judge.

Pending before the Court are the Parties' phase-two summary judgment motions. Also pending are preliminary motions filed by Hughes. With this Order, each motion is addressed.

## I. HUGHES' PRELIMINARY MOTIONS

Hughes has filed two preliminary motions: (1) motion to determine the sufficiency of Insurance Company of North America's ("INA") objections and responses to Hughes' first and second requests for admission; and (2) motion to strike affidavits of David Schoeggl.

### A. *Sufficiency of Requests for Admission*

On December 3, 1990 and January 10, 1991 Hughes served INA with requests for admissions. Hughes' requests for admissions address a broad range of documents including regulatory pronouncements, insurance service organization documents, and pollution claims by other policyholders. Hughes requested admission to the genuineness, authenticity, and hearsay qualities of the many documents. Hughes moves the Court to determine the sufficiency of INA's responses and objections to 54 of the requests.

INA's objections largely rest on relevance and on this Court's earlier order denying Hughes' motion to compel these documents. The Court will overrule INA's objections and directs INA to admit or deny the requests for admissions.

While this Court declined to compel the document's production, that ruling was based on INA's burden with respect to their marginal relevance. Clearly, the burdensome nature has been ameliorated.

With this Order, the Court has ruled on the extant phase-two motions. To the extent that Hughes wishes to submit any of the admissions as substantive evidence that are not already before the Court, they are untimely and too late to be considered in connection with phase-two motions.[1] Hughes may submit any and all its evidence with subsequent motions or at trial.

### B. *Motion to Strike*

Hughes moves to strike the affidavits of David Schoeggl. The affidavits, argue Hughes, contain unsupported conclusions. In the alternative, Hughes requests an opportunity to have discovery on the factual assertions.

The Court has reviewed the affidavits. While they are questionable in that they summarize and arguably interpret the many policies, the Court will not strike the affidavits. The Court is cognizant of the alleged deficiencies. The Court's rulings, as contained herein, do not rely on Mr. Schoeggl's affidavits as substantive evidence. Accordingly, to the extent they are deficient, they have not harmed Hughes.

## II. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The initial burden rests on the moving party to point out the absence of any genuine issue of material fact. Once satisfied, the burden shifts to the opponent to demonstrate through production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

A party opposing summary judgment may not rest on its pleadings. Fed. R.Civ.P. 56(e). Although reference is made to the movant's "burden," Rule 56 places no evidentiary burden on the moving party beyond that which is required to prevail at trial. Therefore, while it is incumbent upon the adverse party to offer evidence sufficient to raise a genuine issue of fact on an issue on which that party has the burden of proof, the moving party need provide nothing more than a reference to those materials on file in the case which supports the movant's belief that there is an absence of any genuine issue of materi-

---

1. The Court notes that phase-two motions were to be filed on or before May 3, 1991, their oppositions were due June 14, 1991, and their replies due by July 9, 1991. Hughes filed this motion on June 27, 1991.

al fact. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990).

When judging the evidence at the summary judgment stage, a district court is not to make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the non-moving party. *Id.*

Summary judgment is appropriate "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552).

The ultimate question is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence from which the jury could reasonably find for the non-movant. *Id.* at 252, 106 S.Ct. at 2512.

Finally, if the factual context makes the non-movant's claim implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### III. INSURANCE CONTRACT INTERPRETATION

Several recurring legal issues appear throughout the many summary judgment motions. Because the Court will grant Hughes' motion to apply California law to the INA policies, both Arizona and California law is discussed.

■ A threshold question is whether the disputed-policy terms are ambiguous. The question is one of law to be determined by the Court. *See, e.g., Sparks v. Republic Nat. Life Ins. Co.,* 132 Ariz. 529, 647 P.2d 1127 (1982).

#### A. What is an Ambiguity?

■ Arizona courts find an ambiguity as a matter of law "where various jurisdictions reach different conclusions as to the meaning, intent, and effect of the language of an insurance contract." *Federal Ins. Co. v. P.A.T. Homes, Inc.,* 113 Ariz. 136, 138, 547 P.2d 1050, 1052 (1976).[2] The *Federal Ins. Co.* rule is not applicable where Arizona courts have ruled on the disputed terms. *See, e.g., Behrens v. Aetna Life & Casualty,* 153 Ariz. 301, 736 P.2d 385 (Ct. App.1989).

Where courts have yet to take a position, Arizona courts must apply the words' ordinary meanings. *See, e.g., Millar v. State Farm and Casualty Co.,* 167 Ariz. 93, 804 P.2d 822 (Ct.App.1990). In determining whether there is an ambiguity, the court should examine the language from the standpoint of one not trained in the law. *See, e.g., Sparks.* The Court will consider, however, the parties' relative sophistication when examining the contract's ambiguous character. *Cf. Darner Motor Sales v. Universal Underwriters,* 140 Ariz. 383, 391, 682 P.2d 388, 396 (1984).

■ California courts take a slightly different approach. The disputed terms must be susceptible to more than one reasonable meaning. *Reserve Ins. Co. v. Pisciotta,* 30 Cal.3d 800, 640 P.2d 764, 180 Cal.Rptr. 628 (1984)). "Words used in an insurance poli-

---

2. There is doubt as to whether Arizona courts still follow such a rule. In *Darner Motor Sales v. Univ. Underwriters,* 140 Ariz. 383, 389, 682 P.2d 388, 394 (1984), the Arizona Supreme Court, in *dicta,* noted that under this approach "we may find ourselves justly criticized for accepting the inventions of other courts." In *State Farm Mut. Auto. Ins. Co. v. Wilson,* 162 Ariz. 251, 257, 782 P.2d 727, 733 (1989), that Court took somewhat of a schizophrenic approach. While the Court criticized other courts for feeling constrained to first find an ambiguity before construing the term, the Court announced that its rule of interpretation applies to a "clause subject to different interpretations." *Id.* This Court finds that the *Federal Ins. Co.* rule is still applicable.

cy are to be interpreted within the plain meaning which a layman would ascribe to them." *Reserve Ins. Co.*, 30 Cal.3d at 803, 640 P.2d at 767, 180 Cal.Rptr. at 631. The plain meaning must be evaluated in light of the insured's objectively reasonable expectation. *Insurance Co. of N. Am. v. Sam Harris Constr. Co.*, 22 Cal.3d 409, 583 P.2d 1335, 149 Cal.Rptr. 292 (1978). Such a rule is designed to discover the parties' mutual intent. *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 799 P.2d 1253, 274 Cal.Rptr. 820 (1990).

### B. *What is the Effect of an Ambiguity?*

■ Arizona courts, unlike many others, do not automatically construe ambiguous insurance terms against the insurer. Rather, "the rule in Arizona is that we construe a clause subject to different interpretations by examining the language of the clause, public policy considerations, and the purpose of the transaction as a whole." *See State Farm Mut. Auto. Ins. Co. v. Wilson*, 162 Ariz. 251, 257, 782 P.2d 727, 733 (1989) (citing *Arizona Prop. & Casualty Ins. Guar. Fund v. Helme*, 153 Ariz. 129, 135, 735 P.2d 451, 457 (1984)). Further, "[t]he existence of ambiguity that militates in favor of construction against the drafter can be determined only *after* these questions have been answered." *Wilson*, 162 Ariz. at 257, 782 P.2d at 733 (emphasis added).

■ Under California law, an ambiguous term is construed differently. Any ambiguity is to be resolved against the insurer. *Reserve Ins. Co.*, 30 Cal.3d at 804, 640 P.2d at 768, 180 Cal.Rptr. at 632. The Court's "function is not to select one particular definition ... but rather to apply from among the range of reasonable meanings the definition which most favors coverage for the insured." *Reserve Ins. Co.*, 30 Cal.3d at 806, 640 P.2d at 770, 180 Cal. Rptr. at 636. The "contra-insurer" resolution of ambiguities does not apply where the policy is the product of even-handed negotiations. *AIU Ins. Co.*, 51 Cal.3d at 819, 799 P.2d at 1265, 274 Cal.Rptr. at 832. Before abandoning the "contra-insurer" rule, however, there must evidence that the *contested* provision was negotiated. *Id.*

### C. *Parole Evidence*

■ The Arizona Supreme Court in *Darner*, extensively addressed the parole-evidence issue. The *Darner* Court, addressing an insurance contract where the insured claimed that the insurer's agent had agreed to a different term than stated in the contract, held that Arizona courts would consider all facts and circumstances in order to determine the real agreement.

The Court noted that when dealing with standardized, boilerplate contracts, the Court would enforce the reasonable expectations of the insured and bind them only to those known terms. *Darner*, 140 Ariz. at 391, 682 P.2d at 396 (adopting RESTATEMENT (SECOND) CONTRACTS, § 211 (1981)). Where the insurer has reason to believe that the insured would not have agreed with the disputed term, the insured is not bound. *Id.*

Importantly, the *Darner* Court noted that this "new" treatment of standardized contracts simply comports with the state-of-the-law regarding treatment of negotiated, bargained-for contracts. The Court's comments on the state-of-the-law are telling:

In Arizona, therefore, the interpretation of a negotiated agreement is not limited to the words set forth in the document. Evidence on surrounding circumstances, including negotiation, prior understandings, subsequent conduct and the like, is taken to determine the parties' intent with regard to integration of the agreement; once the court is able to decide what constitutes the "agreement," the evidence may be used to interpret the meaning of the provisions contained in the agreement. This method obtains even though the parties have bargained for and written the actual words found in the instrument.

*Darner*, 140 Ariz. at 393, 682 P.2d at 388.

The ultimate inquiry, "which applies to all contracts," is "to attempt to discover the intent of the parties, in so far as the intent existed" and to attempt to "ascertain the real agreement." *Id.* Thus, after *Darner*, it becomes clear that the Court may

look to parole evidence when interpreting a contract. It is also clear that when dealing with standardized agreements, the reasonable expectations of the insured become a guiding principle.

■ California courts similarly consider extrinsic evidence to determine the parties' intent. *See, e.g., Pacific Gas & Elec. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 442 P.2d 641, 69 Cal.Rptr. 561 (1968). Thus, Arizona and California law are in basic agreement.

### IV. HUGHES' CHOICE–OF–LAW MOTION

■ With this motion Hughes seeks a determination of the law to be applied to the interpretation of insurance policies issued by INA. Hughes argues that California law should apply to the contracts' interpretation. The Court agrees.

### A. *Background*

California was and remains Hughes' principal place of business. In underwriting information provided to INA, Hughes listed California as having 86% of its payroll figures and Arizona having 10%. When Hughes' broker transmitted the 1965 premium invoices, it billed the California operations at $139,085 and the Arizona operations at $10,000. It is also undisputed that the INA policies were negotiated, executed, and tendered in California and the premiums were paid by Hughes in California.

3. The *Schwartz* ruling upholding interspousal immunity was overruled by *Fernandez v. Romo,* 132 Ariz. 447, 646 P.2d 878 (1982). The choice-of-law holding, however, remains good law.

4. The parties argue over the applicability of Comment (f) to this section which states:
 *f. Multiple risk policies.* A special problem is presented by multiple risk policies which insure against risks located in several states. A single policy may, for example, insure dwelling houses located in states X, Y and Z. These states may require that any fire insurance policy on buildings situated within their territory shall be in a special statutory form. If so, the single policy will usually incorporate

### B. *Discussion*

Because this Court has subject matter jurisdiction under diversity of citizenship, the Court must apply Arizona's conflict of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Arizona courts adopt the Restatement's approach. *Schwartz v. Schwartz,* 103 Ariz. 562, 447 P.2d 254 (1968);[3] *Bryant v. Silverman,* 146 Ariz. 41, 703 P.2d 1190 (1985).

The Restatement, addressing conflict of laws, deals specifically with insurance contracts at Section 193. That Section states:
 § 193. Contracts of Fire, Surety, or Casualty Insurance
 The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

RESTATEMENT (SECOND) CONFLICTS § 193 (1971).[4]

Section 6 factors are "choice-influencing factors which a court should consider in choosing the applicable law." *Gordon v. Kramer,* 124 Ariz. 442, 443–44, 604 P.2d 1153, 1154–55 (Ct.App.1979). Section 6 provides, in relevant part:
 (2) [T]he factors relevant to the choice of the applicable rule of law include

 the special statutory forms of the several states involved. Presumably, the courts would be inclined to treat such a case, at least with respect to most issues, as if it involved three policies, each insuring an individual risk. So, if the house located in state X were damaged by fire, it is thought that the court would determine the rights and obligations of the parties under the policy, at least with respect to most issues, in accordance with the local law of X. In any event, that part of a policy which incorporates the special statutory form of a state would be construed in accordance with the rules of construction of that state.

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in determination and application of the law to be applied.

RESTATEMENT (SECOND) CONFLICTS § 6 (1971).

The Restatement further provides that these principles or factors need be applied to the relevant contacts. Section 188, applicable to all contracts, sets forth the relevant contacts:

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation, and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiation of the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

RESTATEMENT (SECOND) CONFLICTS § 188 (1971).

A mechanical application of the Restatement [5] cuts strongly in favor of applying California law. Hughes' evidence regarding the parties' understanding as to the principal location of the insured risk is uncontroverted. Clearly, the apportionment of premiums and therefore the risks reflect that California was the principal location of the risk.

The Court concludes that the principles set forth in Section 6, as applied to the relevant contacts as set forth in Section 188, do not require a different result. All of the relevant contacts point to California. Thus, when those contacts are applied to Section 6 principles, the Court is left with the unmistakable conclusion that it must apply California law.

It is argued that the place of the injury-causing conduct must be considered. This contact, however, is not listed in the Restatement. Although other courts [6] have relied on that factor, those courts never considered the Restatement. Arizona courts, however, have repeatedly held that the Restatement controls. *See Bryant.*

## V. ABSOLUTE POLLUTION EXCLUSION

With this motion Smith and Company Underwriters ("Lloyd's") asks the Court to hold as a matter of law that seven [7] of its excess CGL policies, containing the "AVN 46A" pollution exclusion, provide no coverage to Hughes for claims made in the *Valenzuela* litigation. The motion will be granted in part.

■ The AVN 46A exclusion is found in 1971–74 policies and provides:

---

**5.** Comment (f) has no application. That Comment addresses policies drafted under states' statutory guidelines.

**6.** *See, e.g., General Accident Ins. Co. v. Namesnik,* 790 F.2d 1397 (9th Cir.1986); *Mission Ins. v. Nethers,* 119 Ariz. 405, 581 P.2d 250 (Ct.App. 1978).

**7.** Two of the seven excess comprehensive general liability ("CGL") policies contain the almost-identical exclusion, AVN 46B. The differences between AVN 46A and AVN 46B are insignificant.

1. This policy does not cover claims directly or indirectly occasioned by happening through or in consequence of:

. . . . .

(b) pollution and contamination of any kind whatsoever....

unless caused by a crash explosion or collision of a recorded in-flight emergency causing abnormal aircraft operation.

The Court finds the exclusion to be unambiguous. Despite Hughes' arguments to the contrary, the mere mention of aircraft does not create an ambiguity. It is true that the exclusion, by its very terms, does not apply to "a crash explosion or collision of a recorded in-flight emergency causing abnormal aircraft operation." That reference, however, does not suggest that the exclusion itself applies to aircraft; it is the exception to the exclusion that applies to aircraft.

Importantly, the exclusion is part of an excess CGL policy and, unless otherwise stated, its exclusionary impact applies to comprehensive liability. Indeed, the underlying policies that insure no aircraft risks contain the same exclusion. Without more, the Court will not restrict the exclusion and frustrate its effect. There is no ambiguity. Thus, the exclusion applies.

The Court observes that this is not a standardized contract. Because Hughes is a sophisticated buyer of insurance, it defies common sense to call this a contract of adhesion. Instead, the Court characterizes the contract as "bargained-for" and negotiated. Under *Darner*, therefore, the "reasonable expectation" doctrine is not applied.

While parole evidence is examined, it does not create material questions of fact. The drafting history has little or no relevance because Hughes has failed to tie it to the parties' intent. As Lloyd's correctly notes, there is no evidence that either Lloyd's or Hughes relied on the exclusion's birthright when inserting it into the CGL policy.

The other parole evidence cuts against Hughes. Warner's letter [8] and the subsequent negotiation of AVN 46A out of the post–1973 excess policies demonstrate that the parties intended the broad scope of the exclusion.

Finally, the Court finds that policies numbered MMS 1160 and MMS 1161 do not incorporate the disputed exclusion, and therefore, coverage is not excluded under those policies. These excess policies contain the AVN 46 exclusion, not the AVN 46A exclusion. The former has no pollution exclusion.

The Insurers argue that because the underlying policies contain the AVN 46A exclusion, these excess policies have the same exclusion. The Court disagrees.

Many of the provisions in the underlying policies are not contained in the excess policies. To account for such language differences, the excess policies employ following-form language which provides that the same coverage exists "except as otherwise provided herein." That phrase tells the insured that the excess policy "follows form" unless inconsistent and, if so, the excess policy controls.

Here, the language is inconsistent; the excess policies provide a narrower exclusion, and therefore greater coverage. Accordingly, the narrower AVN 46 exclusions found in the excess policies control. AVN 46A will not exclude coverage in MMS 1160 and MMS 1161 because the exclusion is not contained therein.

---

8. Warner, Hughes' insurance broker, wrote to Hughes' in-house insurance manager, Barry Griffin, when Lloyd's placed the AVN 46A in the policies. He wrote:

Upon studying the new form, which begins as a noise exclusion, we note that it extends considerably beyond the scope of the prior AVN 46 exclusion form and in broad, inclusive terms. We do not like this exclusion being demanded by Underwriters and this office is exerting strong efforts to alleviate its severity. It appears, however, that all carriers are attempting to impose some form of pollution exclusion or contamination exclusion and efforts to eliminate such clauses are not yielding particularly favorable results.

*Exhibit D* to Schoeggl's Affidavit.

## VI. "SUDDEN AND ACCIDENTAL"

With this motion, the Insurers jointly move for summary judgement on their policies that contain the so-called "pollution exclusion." That exclusion provides:

This insurance does not apply:

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion shall not apply if such discharge, dispersal, release or escape is sudden and accidental.*

The Insurers argue that, as applied to the facts in *Valenzuela,* coverage is excluded as a matter of law. The Court agrees.

### A. *Arizona Law*

 Under Arizona law, the Court has no choice but to find the provision ambiguous. Because jurisdictions have interpreted the issue differently,[9] the clause is ambiguous as a matter of law. *Federal Ins. Co.*

Nevertheless, under *Wilson,* the Court examines the language of the clause in light of public policy considerations and the purpose of the transaction as a whole. Each should be examined to determine, in the *end,* whether the ambiguous clause should be construed against the insurer.

#### 1. Language of the clause

The language of clause states that pollution is excluded from coverage unless it is "sudden and accidental." The United States District Court for the District of Kansas persuasively sets forth the meaning of the disputed provision. *United States Fidelity & Guar. v. Morrison Grain Co.,* 734 F.Supp. 437, 446 (D.Kan.

1990). That court, "fall[ing] in step" with recent opinions, notes that "sudden" combines both the elements of notice or warning and temporal brevity.

This Court finds that "sudden" unmistakably connotes a temporal quality. The *United States Fidelity & Guar.* court agreed:

To divorce "sudden" of its temporal component would eviscerate it of any independent meaning or force.... Depriving "sudden" of its distinct temporal meaning and rendering it mere surplusage because of its use in conjunction with "accidental" directly contradicts Kansas law which requires a contract to be read as a whole and meaning given to all its terms.[10]

*Id.* at 446–47 (citations omitted).

That same court flatly rejected the argument that "sudden" merely restates the definition of occurrence. "Instead of being synonymous with unexpected and unintended, the pollution exclusion restricts coverage to accidents distinct in time and place." *Id.* at 447 (citation omitted). The court further noted that "[a]n even more obvious distinction between the two policy provisions is that the "occurrence" definition addresses the harm caused by the pollution while the exclusion is concerned with the act of releasing or discharging the pollutants." *Id.*

While that court's discussion addresses whether there is an ambiguity, it lucidly sheds light on the clear meaning of the provisions. That clear meaning now needs to be viewed relevant to the other considerations under *Wilson.*

#### 2. Public policy considerations

Courts analyzing ambiguous insurance provisions in light of the public policy, focus on the provision itself. *See, e.g., Transamerica Ins. Group v. Meere,* 143

---

**9.** *See, e.g., Claussen v. Aetna Casualty & Sur. Co.,* 259 Ga. 333, 380 S.E.2d 686 (1989); *United States Fidelity and Guar. v. Star Fire Coals, Inc.,* 856 F.2d 31 (6th Cir.1988).

**10.** Similarly, Arizona courts hold that the purpose of an agreement is to be divined from the

"entire instrument" and the surrounding circumstances and not from the label the parties attach to it. *Darner,* 140 Ariz. at 393, 682 P.2d at 398 (quoting *Smith v. Melson,* 135 Ariz. 119, 121, 659 P.2d 1264, 1266 (1983)).

Ariz. 351, 694 P.2d 181 (1984). Arizona courts have taken the position that public policy forbids contracts indemnifying a person against loss from his own willful wrongdoing. *See, e.g., Meere*, 143 Ariz. at 356, 694 P.2d at 185 (intentional tort provision designed to prevent an insured from acting wrongfully knowing his insurer will "pay the piper").

■ The provision at issue furthers public policy.[11] Limiting coverage to "sudden" pollution, albeit accidental, increases the likelihood that such conduct was unintentional because it decreases likelihood that an insured will turn a blind eye toward negligent waste practices that, over time, poison the environment. In short, the provision excludes conduct that can be characterized as deliberate indifference that might otherwise constitute a covered occurrence. Coverage for such deliberate indifference, while not violative of public policy *per se*, certainly frustrates it.

An interpretation of "sudden" which includes a temporal component, therefore, does not preclude the coverage for "calamity" for which the insured seeks coverage. *Meere* at *Id.* Indeed, it fairly ensures that the insured face such a calamity before turning to his insurers for coverage.

### 3. Purpose of the transaction as a whole

While it is true that the purpose of the transaction as a whole was to afford Hughes comprehensive general liability, the purpose of the transaction cannot be analyzed with such broad strokes. The purpose of the transaction must be measured in accordance with the parties' understanding and intent with regard to the agreement.

The Insurers chose to exclude from liability gradual environmental contamination and, therefore, added the disputed provision. There is strong evidence that Hughes knew and accepted the exclusion. Hughes, for example, subsequently purchased Environmental Impairment Liability ("EIL") coverage closing the coverage gap created by the exclusion. Under *Darner*, such evidence of "subsequent conduct":

> is taken to determine the parties' intent with regard to integration of the agreement; once the court is able to decide what constitutes the "agreement," the evidence may be used to interpret the meaning of the provisions contained in the agreement.

*Darner*, 140 Ariz. at 393, 682 P.2d at 397.

Again, it is not lost on the Court that Hughes is not an unsophisticated consumer. Hughes maintained its own insurance department and staffed it with professionals. Also, Hughes employed professional insurance brokers.

This Court's conclusion is supported by a recent decision of the First Circuit construing a "sudden and accidental" pollution exclusion. There, the court stated that it was "illogical to believe that insurers intended through the sudden and accidental excep-

---

11. Hughes argues that social policy militates for coverage in its favor because the Insurers' representatives, when introducing the provision, misrepresented the provision's effect by arguing that the provision "clarified" existing coverage. This evidence has little bearing on public policy considerations. There is no evidence that the Arizona legislature or Arizona policy makers or even Hughes relied on the alleged misrepresentations.

Even if that were the case, the Insurers' representations arguably clarified the Insurers' position and were not in fact misrepresentations. The evidence Hughes presents suggests that the insurers, at that time, believed "occurrence" only included damages that were the result of discharges that were both sudden and accidental. *See Hughes' Exhibit* no. 16. Writing to the State of West Virginia's Insurance Commission-

er, the Insurance Regulatory Board's secretary stated:

> The endorsement is actually a clarification of the original intent, in that the definition of occurrence already excludes damages that can be said to be expected or intended. However, coverage would be afforded, as heretofore, where the damage was the result of a discharge, dispersal or escape that was sudden and accidental.

*Id. See also Hughes' Exhibit* no. 26 (speaking to pollution "over a long period of time" or due to "willful negligence"). Certainly, the Insurers' "clarification" on intent could have been understood to address circumstances involving deliberate indifference. The bottom line, however, with regard to this evidence is that it is *too inconclusive* to have a significant impact on public policy considerations.

tion to buy into a risk" of insuring pollution-prone operations.[12] *Lumbermens Mut. Cas. Co. v. Belleville Ind., Inc.,* 938 F.2d 1423, 1429 (1st Cir.1991). Thus, the court concluded that the insurer was only "willing to commit to covering a possible but unlikely event resulting in the release of pollutants." *Id.* at 1428.

In the Court's opinion, an interpretation of "sudden" that fails to recognize its temporal quality frustrates the parties' intent and understanding of their agreement. Such a contra-insurer interpretation would, therefore, undermine the overall purpose of the transaction.

4. Final inquiry.

■ Under *Wilson,* the Court should determine whether the ambiguity should be construed against the insurer after the above inquiry is conducted. The *Wilson* Court stated:

> In this case nothing in the nature of the transaction or the dickered deal would lead the consumer to expect coverage. Thus, there is no reason to adopt the construction favoring coverage when such construction actually does violence to legislative goals, social policy and the nature of the transaction as a whole.

*Wilson,* 162 Ariz. at 258, 782 P.2d at 734.

Like *Wilson,* there is nothing here that would lead Hughes to expect coverage. Indeed, a contra-insurer construction violates the parties' intent and, therefore, the transaction as a whole. Moreover, a contra-insurer interpretation frustrates public policy. There being no reason to adopt the construction favoring the insured, indeed good cause not to, the Court applies a

definition of "sudden" that incorporates the notion of temporal brevity.

B. *California Law*

■ While the Court finds the clause to be . ambiguous under Arizona ·law, the Court is in the rather awkward position of finding no ambiguity under California law.[13] The Court adopts the analysis set forth in *United States Fidelity & Guar.*

C. *Application to Valenzuela*

■ While Hughes argues that the *Valenzuela* facts preclude summary judgment as to whether the pollution was sudden, the Court disagrees. The uncontroverted evidence demonstrates that the pollution arises from Hughes' pattern of waste practices over a span of more than 20 years. Those practices are at issue.

While it may be true that there were isolated incidents[14] that led to greater pollution, those occurrences, can be in no way be characterized as so "sudden" so as to fall outside the exclusion. The Court will not permit Hughes to break down its long-term waste practices into temporal-component parts in order to find coverage where the evidence unequivocally demonstrates that the pollution was gradual. The polluting events cannot and will not be isolated for the purpose of eviscerating an unambiguous insurance exclusion. The motion will be granted.

Again, this Court's analysis is buttressed by the First Circuit's decision in *Lumbermens.* There, the court rejected coverage under a sudden and accidental exception where the insured had engaged in operations involving continual pollution for a

12. The First Circuit described pollution-prone operations as those where emission of pollutants is part and parcel of the daily operations. These polluting incidents were likely to occur on the fringe of the operations, yet insureds seek to characterize them as sudden and accidental. The court went on to hold that the sudden and accidental exception did not provide coverage "when the discharges consisted of long, accumulated, unattended, and unsegregated pollutants, and were caused by events not clearly beyond the the long-range reasonable expectation of the insured." *Lumbermens,* at 1428.

13. Clearly, this is a paradox. Ambiguity, in the insurance context, has taken on an ambiguous characterization of its own. The conflict, however, is only superficial. Both approaches have the Court closely scrutinize the policy language.

14. The evidence demonstrates that Hughes encountered periodic episodes where the waste treatment plant broke down or was over-capacitated.

lengthy period of time. *Lumbermens,* at 1430.

The insured's manufacturing operations involved the continual use of PCBs, polychlorinated biphenyls. *Id.* at 1424. The insured argued that the pollution resulted from two "sudden and accidental" events, a violent rainstorm and a fire. *Id.* at 1425. The court, however, held that the sudden and accidental exception did not provide coverage "when the discharges consisted of long accumulated, unattended, and unsegregated pollutants, and were caused by events not clearly beyond the long-range reasonable expectations of the insured." *Id.* at 1428. The incidents at Hughes that led to the release of pollutants in the instant matter,[15] and the principles employed in this Court's ruling are similar to those used by the First Circuit.

## VII. HUGHES' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST INA

There are two INA policies in dispute. The policies are identical. Hughes moves for partial summary judgment against INA on both policies. The Court will grant the motion in part.

### A. *Hughes' Motion*

Hughes seeks: (1) a court order that the definition of "occurrence" applies only to "Insuring Agreements" II and IV (there are eight), and not to claims under Insuring Agreement I; (2) a court order that with regard to Insuring Agreement I, "occurrence" means "any event, incident, or happening"; (3) that the policies do not exclude coverage under Insuring Agreement I for bodily injuries that "are neither expected nor intended from the standpoint of the insured," but rather only those injuries resulting from acts prohibited under California Insurance Code § 533; and (4) a court order that bodily injuries under Insuring Agreement I do not have to occur during the period of INA policies.

### B. *Discussion*

This dispute focuses on the term "occurrence" and its definition, or lack thereof in the INA policy. Hughes seeks coverage under Insurance Agreement I which addresses bodily injury.

Of the eight insuring agreements in the policy, only two employ the term "occurrence"—Insuring Agreement II covering property damage and Insuring Agreement IV covering Hangar Keeper's liability. Those insuring agreements provide coverage "caused by an occurrence as defined herein."

Similarly, the definition of "occurrence" expressly limits its application to Insuring Agreements II and IV. That definition states:

> "Occurrence" with respect to Insuring agreements II and IV, means either an accident or continuous or repeated exposure to conditions which unexpectedly results in injury or to destruction of property during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

*Policy Definitions* (emphasis added).

1. A court order that the definition of "occurrence" applies only to "Insuring Agreements" II and IV?

The Court will grant this request. The parties do not argue over whether that policy definition applies. While INA ultimately argues that the definition contained therein should apply, it does not argue that the source of the "occurrence" definition should be found in the policy definition. Accordingly, the Court finds that with respect to Insuring Agreement I, there is no policy definition of "occurrence," and the definition contained in the policy applies only to Insuring Agreements II and IV.

2. A court order that with regard to Insuring Agreement I, "occurrence" means "any event, incident, or happening"?

 This request will be denied. The Court looks at the policy language to deter-

---

15. *See supra* footnote 14.

mine objectively the parties' intent. The plain meaning should be applied to determine whether the parties could reasonably believe the broad definition applies. *AIU*.

It cannot be disputed that the policy defines occurrence and limits that definition to Insuring Agreements II and IV. While the omission suggests that there are different definitions, there is no evidence that the parties ever intended Hughes' broad interpretation. The Court must look at the insured's reasonable expectations to determine the parties' intent. The limiting language, however, does not suggest in any way that the parties intended such a broad definition.

While it may be true the "occurrence" definition is limited only by public policy, California Insurance Code's Section 533 [16] does not solely define that limit. That Section, along with cases such as *J.C. Penny Casualty Ins. Co. v. M.K.*, 52 Cal.3d 1009, 804 P.2d 689, 278 Cal.Rptr. 64 (1991) and *Fire Ins. Exch. v. Abbott*, 204 Cal.App.3d 1012, 251 Cal.Rptr. 620 (1988) look at issues involving *intent*. Those courts make a distinction, as do most courts addressing insurance coverage in intentional tort cases, between specific and general intent. California Insurance Code's Section 533 and its supporting case law embody the concept that an intentional-tort exclusion excludes conduct only where the insured's specific intent to injure is present.

Section 533 and its supporting case law, however, do not apply where intent is not a factor. Its inapplicability to the case at bar is highlighted by footnote 16 in *AIU Ins. Co.* where the California Court of Appeals noted that if waste disposal were "willful,"

Section 533 prohibited coverage for cleanup costs. The court never addressed specific or general intent.[17] When addressing waste disposal, no distinction between specific and general intent can logically apply because few companies employ waste practices with an intent to injure persons or the environment.

Clearly, the parties intended, and public policy requires, some element of fortuity in their indemnification contracts. *See, e.g.*, R. Keeton & A. Widdis, *Insurance Law* § 5.3(a) (1988). That fortuitous element, in a general comprehensive occurrence policy, focuses on something different from the intentional character of the damages. It must focus on that which is unexpected. The "unexpected," in the Court's opinion, incorporates the unintended, if that were at issue.[18] The unexpected is, in essence, the heart of fortuity and this Court will so find.[19]

3. A court order that the policies do not exclude coverage under Insuring Agreement I for bodily injuries that "are neither expected nor intended from the standpoint of the insured," but rather only those injuries resulting from acts prohibited under California Insurance Code § 533?

Because Hughes' request incorrectly limits the definition to Section 533, which focuses only intentional conduct, this request will be denied.

4. A court order that bodily injuries under Insuring Agreement I, do not have to occur during the period of INA policies?

Hughes argues that *Sam Harris Constr. Co.* is controlling. The Court disagrees and will deny this request.

---

16. Section 533 states:

> An insurer is not liable for a loss caused by a wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others.

CAL.INS.CODE § 533 (West 1972).

17. If intent were deemed to be a factor, *AIU Ins. Co.* may be a signal that California courts would find an intent as a matter of law. *See, e.g., J.C. Penny Casualty Ins. Co.*

18. Indeed, courts holding that intentional tort exclusions only exclude conduct involving spe-

cific intent, implicitly recognizes that when an insured acts intentionally, such as striking out in self-defense, the "unexpected" event is the harm caused. The insured, therefore, is covered. *Meere*.

19. This interpretation is supported by other statutory provisions in the California code. Section 250, for example, limits "insurable events" to "any contingent or unknown event." CAL.INS. CODE § 250 (West 1972). Similarly, section 22 defines an insurance contract as indemnification against "contingent or unknown" events. *Id.* at section 22.

■ In *Sam Harris Constr. Co.*, the California Supreme Court addressed the meaning of "occurrences or accidents." The insured in *Sam Harris Constr. Co.* sought indemnity where the negligent act occurred during the policy period but the injury to a third party occurred afterwards. Because the disputed-policy terms were undefined in the policy, the Court abandoned the ordinary rule that the time of occurrence is when the complaining party was injured and found coverage despite the fact that the complaining party was injured outside the policy period. Looking to the insured's reasonable expectation, the Court applied Webster's very broad definition. The Court observed:

> Defendants contend they purchased the policy with an expectation that the insurer would defend suits based on "occurrences" as well as "accidents"; ... The words "occurrences" and "accidents" are linked here by the conjunction "or", [sic] a term that usually introduces the second of two alternatives. Sometimes the words are used synonymously. Here, however, they do not appear redundant. They rather suggest that accidents are distinguishable from occurrences.

*Sam Harris Constr. Co.*, 22 Cal.3d at 410, 583 P.2d at 1336, 149 Cal.Rptr. at 293.

Here, Hughes presents no evidence that supports an inference that it expected anything different from that which all courts recognized was an accepted policy limit on occurrence-based coverage. *Chu v. Canadian Indem. Co.*, 224 Cal.App.3d 86, 274 Cal.Rptr. 20 (1990); *see also Remmer v. Glens Falls. Indem. Co.*, 140 Cal.App.2d 84, 295 P.2d 19 (1956). As noted, those courts held that an "occurrence" happens when the complaining party is injured during the policy period.

INA correctly notes that its policy language supports this interpretation.[20] Hughes points to nothing that would support another interpretation. Given the state of the law, the policy language, and an absence of probative evidence supporting a contrary interpretation, the Court finds no reasonable expectation that there was coverage where the injury occurred outside the policy period.

## VIII. "EXPECTED OR INTENDED"

### A. *The Motion*

The Insurers jointly move for summary judgment on their various policies and ask the Court to hold that the *Valenzuela* claims are not "occurrences" under any of their policies. While the language differs in the many policies, they can be categorized in to two groups: (1) those policies that insure against "occurrences" but do not define it;[21] and (2) those policies that define occurrence as conduct that is "neither expected nor intended from the standpoint of the insured."

### B. *Discussion*

■ While the "neither expected nor intended language" is found in the definition of "occurrence," most courts treat the provision as an *exclusion. See, e.g., Clemco Indus. v. Commercial Union Ins. Co.*, 665 F.Supp. 816, 820 (N.D.Calif.1987), *aff'd* 848 F.2d 1242 (9th Cir.1988); *Phoenix Pest Control Systems, Inc. v. Insurance Co. of*

**20.** The "Policy Period" provision, for example, notes that:

> With respect to any occurrence involving a missing aircraft such occurrence shall be deemed to have occurred during the policy period if such aircraft shall have commenced flight or shall have been last reported, whichever may last occur, during the policy period.

The second clause establishes a constructive time for occurrence for missing planes, focuses on the plane's loss or destruction.

Similarly, Insuring Agreement I covers bodily injury "including death at any time resulting therefrom" which clarifies that coverage is provided if injured during the policy period even if the third party subsequently dies after expiration of coverage. Finally, its notice provision provides that "written notice of each occurrence" shall contain "the time, place and circumstances of the occurrence, the name and address of the injured and all available witnesses."

**21.** This group involves: (1) policies covering occurrence, but not defining it; and (2) the policies using the term "accident." Hughes has moved for partial summary judgment on INA policies that employ the undefined-occurrence term. That motion is addressed Section VII of this Order.

*N. Am.,* 165 Ariz. 31, 34–35, 796 P.2d 463, 466–67 (1990). The Court will do likewise. Accordingly, the burden lies with the Insurers to prove the exclusion applies.

Both Arizona and California courts employ a subjective test to the phrase but focus on "intent." In *Phoenix Pest Control Systems, Inc.,* for example, the Arizona Supreme Court reversed the trial court's granting of summary judgment where the insured was sued for copyright infringement. The *Phoenix Pest Control Systems, Inc.* Court observed:

> Determining whether an insured acts intentionally for purposes of insurance law is different than for purposes of tort law because there is no presumption in insurance law that a person intends the ordinary consequences of his actions.
>
> A two-prong inquiry is applied in Arizona to determine an insured's intent. First, intent is determined by looking at the insured's subjective desire to cause harm. An act, even though intentional, must be committed for the purpose of inflicting injury or harm.

*Phoenix Pest Control,* 165 Ariz. at 35, 796 P.2d at 467 (citations omitted). California courts have come to a similar conclusion. *See, e.g., Clemco Indus.*

The Court finds the Insurers' contrary authorities to be unpersuasive. In *Western Casualty & Sur. Co. v. Hays,* 162 Ariz. 61, 781 P.2d 38 (Ct.App.1989), for example, the Arizona Court of Appeals affirmed the lower court's grant of summary judgment in favor of the insured on the "neither expected nor intended" language. While that case may be read as applying an objective test, it is more properly read as finding that no reasonable person could believe that the insured did not *subjectively* hold the requisite intent.

Similarly, the Insurers point to *Malanga v. Royal Indem. Co.,* 101 Ariz. 588, 422 P.2d 704 (1967), to support the proposition that the Arizona courts employ an objective test when addressing "accidents." [22] That Court, however, interpreted the phrase found in a first party liability insurance contract and cited another Arizona Supreme Court decision which similarly ruled on a first party contract. *Malanga,* 101 Ariz. at 591, 422 P.2d at 707.

The Court again notes that Arizona and California courts addressing the provision focus on the "intent" aspect and apply a subjective standard. Under the express wording of the policies, an occurrence is excluded when the damage is either expected or intended. Either state of mind, expectation or intent, precludes coverage. Because the insured's intent is measured subjectively, it follows that the insured's expectations should be measured similarly. It makes no sense to apply a subjective standard to one part of the clause and not the other.

The subjective interpretation is supported by the fact that the "neither expected nor intended" language is followed by the phrase *"from the standpoint of the insured."* As Hartford's counsel eloquently noted at oral argument "a word is known by the company it keeps." The phrase does not say from the standpoint of a "reasonable person." The Illinois Court of Appeals made that very observation:

> Aetna also points to the phrase "from the standpoint of the insured" as evidence that an objective standard was intended. We are not persuaded. Historically this phrase was added to homeowners' policies to protect insurance companies from a court finding that while the insured may have acted intentionally, the injured party met with an accident. In any event, referencing the insured as opposed to a hypothetical reasonable man, this phrase, if anything, supports our imposition of a subjective or personal standard.

*Aetna Casualty & Sur. Co. v. Dichtl,* 78 Ill.App.3d 970, 976, 34 Ill.Dec. 759, 765, 398 N.E.2d 582, 588 (1980).

With respect to those policies that may employ terms such as an undefined occurrence, accident, or other similar language,

---

**22.** In *Malanga,* the Arizona Supreme Court ruled that an insured, who overdosed on a mixture of alcohol and barbiturates, "accidentally" died, because a reasonable man, under the circumstances, would not have anticipated the result.

the Court finds that the policies incorporate the fortuity element as set forth in Part VII of this Order. The Court further finds that a subjective standard shall be sued unless otherwise stated clearly and unequivocally.

■ The final question raised is whether, applying a subjective standard, the Insurers are entitled to summary judgment. Can the Court say as a matter of law that Hughes expected the damages?[23] The Court is unprepared, at this time, to make such a ruling.

Hughes, at oral argument, complained that Insurers' motion unfairly implicated phase-three issues. The Court agrees and finds that the Insurers' attempt to address the issues with this motion may have denied Hughes an opportunity to respond adequately to the factual record.[24] Indeed, the attempt may have worked to deny the Insurers an opportunity to set forth fully its position.

The Court believes that the application of the policies are phase-three issues. The application of the policies to the massive evidentiary record are best addressed in a more focused summary judgment proceeding. The Court will deny, without prejudice, the motion insofar as it seeks application of the policies, with leave to re-file summary judgment motions on that issue, if desired.

If and when the parties file such motions, they are directed to Part II of this Order. Unless persuaded otherwise, the Court will apply the summary judgment standards as set forth herein. The Court notes that it will apply those standards keeping in mind that the Insurers bear the burden of proof. Said motions may refer to the evidence submitted with phase two-motions and are to be filed no later than 60 days from the date of this Order.

## IX. CONCLUSION

IT IS THEREFORE ORDERED THAT:

(1) Hughes' motion to determine the sufficiency of INA's objections and responses to Hughes' requests for admissions is GRANTED;

(2) Hughes' motion to strike is DENIED;

(3) Hughes' motion for determination of law to be applied to interpretation of the INA policies is GRANTED;

(4) Lloyd's motion for summary judgment on AVN 46A exclusion is DENIED for policy nos. MMS 1160 and MMS 1161 and GRANTED for the others;

(5) Insurers' joint motion for summary judgment on their "sudden and accidental" pollution exclusion is GRANTED;

(6) Hughes' motion for summary partial judgment on INA policies is GRANTED in part and DENIED in part as set forth in Part VII of this Order;

(7) Insurers' joint motion for summary judgment on "expected or intended" is DENIED without prejudice. The parties are granted leave to file motions addressing the application of the Court's interpretation of the policy terms to *Valenzuela* facts no later than 60 days from the date of this Order.

---

**23.** It should be noted that the common factor between all exclusions is Hughes' expectations. If Hughes subjectively expected the damages, there has been no fortuity; there has been no "occurrence" and all the exclusions are invoked. A finding of such expectation entitles the Insurers to summary judgment on all the policies. Intent, therefore, may need never be explored.

**24.** The Court distinguishes this holding from the application of the "sudden and accidental" language to *Valenzuela*. For the reasons set forth in Part VI of this Order, the Court finds such application to be a non-issue.