636 So.2d 700 (1993)
DIMMITT CHEVROLET, INC., et al., Appellants,
v.
SOUTHEASTERN FIDELITY INSURANCE CORPORATION, Appellee.
No. 78293.
Supreme Court of Florida.
July 1, 1993.
Order Denying Rehearing and Clarification March 31, 1994.
Alan C. Sundberg and William F. McGowan, Jr. of Carlton, Fields, Ward, Emmanuel, Smith and Cutler, Tallahassee, and Thomas K. Bick and Joseph W. Dorn of Kilpatrick and Cody, Washington, DC, for appellants.
Robert E. Austin, Jr., Leesburg, and Hal K. Litchford and Kristyn D. Elliott, Orlando, for appellee.
Robert A. Butterworth, Atty. Gen. and Jeff G. Peters, Asst. Atty. Gen., Tallahassee, amicus curiae for State.
Jeffrey S. Kurtz, City Atty., Delray Beach, and Steven R. Berger and Bradley H. Trushin of Wolpe, Leibowitz, Berger & Brotman, Miami, amicus curiae for City of Delray Beach.
*701 Jeffrey A. Tew and Daniel A. Casey of Kirkpatrick and Lockhart, Miami, amici curiae for The American Fiber Mfrs Ass'n, The American Petroleum Institute, The Chemical Mfrs Ass'n, Intern. Business Machines Corp. and Olin Corp.
George K. Rahdert of Rahdert & Anderson, St. Petersburg, Luther T. Munford of Phelps Dunbar, Jackson, MS; and Richard N. Dicharry and Pamela G. Michiels of Phelps Dunbar, New Orleans, LA, amicus curiae for John Richard Ludbrooke Youell on behalf of Underwriters at Lloyd's, London.
Ronald L. Kammer of Hinshaw and Culbertson, Miami, and Thomas W. Brunner, James M. Johnstone and Lainie J. Simon of Wiley, Rein and Fielding, Washington, DC, amici curiae for Ins. Environmental Litigation Ass'n, Service Ins. Co., Florida Farm Bureau Ins. Co., and American Sur. & Cas. Co.
The Motion for Rehearing is granted. The opinion filed in this case on September 3, 1992, is withdrawn and the following opinion dated July 1, 1993, is substituted in lieu thereof.
McDONALD, SHAW, GRIMES and KOGAN, JJ., concur.
BARKETT, C.J., and OVERTON and HARDING, JJ., dissent.

ON MOTION FOR REHEARING GRANTED
PER CURIAM.
This cause is before the Court on the following certified question of law from the United States Court of Appeals in Industrial Indemnity Insurance Co. v. Crown Auto Dealerships, Inc., 935 F.2d 240 (11th Cir.1991):
WHETHER, AS A MATTER OF LAW, THE POLLUTION EXCLUSION CLAUSE CONTAINED IN THE COMPREHENSIVE GENERAL LIABILITY INSURANCE POLICY PRECLUDES COVERAGE TO ITS INSURED FOR LIABILITY FOR THE ENVIRONMENTAL CONTAMINATION THAT OCCURRED IN THIS CASE.
We have jurisdiction. Art. V, § 3(b)(6), Fla. Const. See also § 25.031, Fla. Stat. (1991); Fla.R.App.P. 9.150.
The court of appeals set forth the following statement of facts and procedural history of this case for our consideration.
The following facts, taken from the district court's opinion, Industrial Indem. Ins. Co. v. Crown Auto Dealerships, 731 F. Supp. 1517, 1518-19 (M.D.Fla. 1990), are undisputed. Appellants Dimmitt Chevrolet, Inc. and Larry Dimmitt Cadillac, Inc. ("Dimmitt") operated two automobile dealerships. From 1974 through 1979, Dimmitt sold the used crankcase oil generated by its business to Peak Oil Company ("Peak"). From 1954 to 1979, Peak recycled the oil at its plant in Hillsborough County, Florida for sale as used oil.
In 1983, the Environmental Protection Agency ("EPA") determined that Peak's oil operations had resulted in extensive soil and groundwater pollution at and around the plant site. Much of this pollution resulted from Peak's placement of waste oil sludge in unlined storage ponds. Chemicals from the sludge then leached into the soil and groundwater. Some of the pollution also derived from oil spills and leaks at the site, including a 1978 incident in which a dike collapsed and allowed oily wastewater to be released from a holding pond, and the occasional runoff of contaminated rainwater.
In July 1987, the EPA notified appellants that a release of hazardous substances had occurred at the Peak site and that appellants were potentially responsible parties ("PRP") for the costs of investigating and cleaning up the pollution. This liability is imposed, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607 et seq., on anyone who generates, transports, or disposes of hazardous substances. In February 1989, Dimmitt and other PRPs entered into two administrative orders with EPA. Without conceding liability, appellants agreed to undertake remedial measures at the Peak site.

*702 Appellee Southeastern Fidelity Insurance Corporation ("Southeastern") provided comprehensive general liability ("CGL") insurance coverage to Dimmitt from 1972 through 1980. The policy covered Dimmitt
for all sums which the INSURED shall become legally obligated to pay as DAMAGES because of A. BODILY INJURY or B. PROPERTY DAMAGE to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the INSURED seeking DAMAGES on account of such BODILY INJURY or PROPERTY DAMAGE, even if any of the allegations of the suit are groundless....
An "occurrence", is defined by the policy as
an accident including continuous or repeated exposure to conditions, which result in BODILY INJURY or PROPERTY DAMAGE neither expected nor intended from the standpoint of the INSURED... .
However, the policy excluded coverage for BODILY INJURY or PROPERTY DAMAGE arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, or gases, waste materials ... into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental... .
In October 1988, Southeastern filed a declaratory judgment action against Dimmitt, seeking a declaration by the district court that Southeastern owed no duty to defend or indemnify Dimmitt under the CGL policy. Dimmitt filed a counterclaim seeking a contrary declaration. Both parties subsequently filed motions for summary judgment. The district court granted summary judgment in favor of Southeastern, reasoning that the pollution exclusion was not ambiguous and that the word "sudden" should be given a temporal meaning. Industrial Indem. Ins. Co. v. Crown Auto Dealerships, 731 F. Supp. 1517 (M.D.Fla. 1990). Accordingly, the district court ruled that the pollution at the Peak site occurred over a period of years and therefore could not be considered "sudden." The district court subsequently denied without opinion Dimmitt's motion to alter or amend the judgment.
Crown Auto, 935 F.2d at 241-42 (footnotes omitted).
As noted by the court of appeals, Dimmitt Chevrolet, Inc. (Dimmitt) was not the actual cause of the pollution damage at issue. Its liability, however, is not in dispute in this case. The issue before us is whether Dimmitt's comprehensive liability insurance policy was intended to cover hazardous waste pollution under the circumstances set forth in the court of appeals' opinion. The question turns on the meaning of the term "sudden and accidental" within the pollution exclusion clause of Dimmitt's policy.
Dimmitt asserts that the term "sudden and accidental" is ambiguous because it is subject to multiple definitions. Thus, because ambiguous terms within an insurance policy should be construed in favor of the insured, the policy should be construed in Dimmitt's favor. Dimmitt argues that the word "sudden" does not have a temporal meaning and that the term was intentionally written so as to provide coverage for unexpected and unintended pollution discharge.
Southeastern Fidelity Insurance Corporation (Southeastern) contends that the clause excludes coverage for all pollution except when the discharge or dispersal of the pollutant occurs abruptly and accidentally. As such, Southeastern asserts that it had no duty to defend or indemnify Dimmitt because the pollution by the actual polluter, Peak Oil Company (Peak), was gradual and occurred over a period of several years.
Both sides also argue that the drafting history of pollution exclusion clauses favors their respective positions. In this regard, it should be noted that comprehensive general liability (CGL) policies are standard insurance policies developed by insurance industry trade associations, and these policies are the primary form of commercial insurance coverage obtained by businesses throughout the country. Before 1966, the standard CGL *703 policy covered only property and personal injury damage that was caused by "accident." Broadwell Realty Servs., Inc. v. Fidelity & Casualty Co., 218 N.J. Super. 516, 528 A.2d 76, 84 (1987). In 1966 the insurance industry switched to "occurrence-based" policies in which the term "occurrence" was defined as "`an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.'" Broadwell, 528 A.2d at 84 (quoting 3 Rowland H. Long, The Law of Liability Insurance App-53 (1966)). Beginning in 1970, the pollution exclusion clause at issue in this case was added to the standard policy. Finally, the policy was again changed in 1984 by the addition of what has been called an "absolute exclusion clause," which totally excludes coverage for pollution clean-up costs that arise from governmental directives. Kenneth S. Abraham, Environmental Liability Insurance Law 161 (1991).
Dimmitt argues that because many state insurance commissioners approved the 1970 addition of the pollution exclusion clause without ordering a reduction in premiums, this indicates that the clause did little more than clarify coverage. Southeastern counters by saying that the reason there was no premium reduction in 1970 was because there had been no premium increase when the coverage was expanded in 1966 to cover occurrences. Both parties also rely on conflicting statements made by insurance representatives who had appeared before state insurance commissions, as well as statements made by other insurance experts.
The policy language at issue here has been the subject of extensive litigation throughout the United States. There is substantial support for both parties' positions. On the one hand, the supreme courts of Colorado, Georgia, West Virginia, and Wisconsin have found the pollution exclusion clause to be ambiguous.[1] In reaching their conclusions, these courts refer to the varying dictionary definitions of the word "sudden." They are also persuaded by the drafting history that the words "sudden and accidental" were intended to mean "unexpected and unintended."
On the other hand, the supreme courts of Massachusetts, Michigan, North Carolina, and Ohio have held that the word "sudden" has a temporal context.[2] Therefore, when the word "sudden" is combined with the word "accidental," the clause means abrupt and unintended. A majority of federal courts of appeal appear to have adopted this view in construing policies in states in which the supreme court of that state has not yet set forth its position.[3]
*704 We are persuaded that the federal district judge properly construed Southeastern's pollution exclusion clause. The ordinary and common usage of the term "sudden" includes a temporal aspect with a sense of immediacy or abruptness. As stated by the court in Hybud Equipment Corp. v. Sphere Drake Insurance Co., 64 Ohio St.3d 657, 597 N.E.2d 1096, 1102 (1992):
As it is most commonly used, "sudden" means happening quickly, abruptly, or without prior notice. This is the plain and ordinary meaning of the word, and the context in which it is employed does not indicate that it should be given any other meaning.
See Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co., 480 N.W.2d 368 (Minn.App. 1992) (sudden means the incident at issue occurred relatively quickly rather than gradually over a long period of time).
Dimmitt points to dictionary definitions of "sudden" which also include the meaning of "happening or coming unexpectedly." Dictionaries are helpful insofar as they set forth the ordinary, usual meaning of words. However, as noted in New Castle County v. Hartford Accident & Indemnity Co., dictionaries are "imperfect yardsticks of ambiguity." 933 F.2d at 1193-94. Our duty is to determine whether the word "sudden" is ambiguous in the context of the specific insurance policy at issue.
The use of the word "sudden" can connote a sense of the unexpected. However, rather than standing alone in the pollution exclusion clause, it is an integral part of the conjunctive phrase "sudden and accidental." The term accidental is generally understood to mean unexpected or unintended. Hartford Accident & Indem. Co. v. United States Fidelity & Guar. Co., 962 F.2d 1484 (10th Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992). Therefore, to construe sudden also to mean unintended and unexpected would render the words sudden and accidental entirely redundant.[4] This analysis is well stated in Northern Ins. Co. v. Aardvark Assocs., Inc.:
"To read `sudden and accidental' to mean only unexpected and unintended is to rewrite the policy by excluding one important pollution coverage requirement  abruptness of the pollution discharge. The very use of the words `sudden and accidental' reveal [sic] a clear intent to define the words differently, stating two separate requirements. Reading `sudden' in its context, i.e. joined by the word `and' to the word `accident', the inescapable conclusion is that `sudden', even if including the concept of unexpectedness, also adds an additional element because `unexpectedness' is already expressed by `accident.' This additional element is the temporal meaning of sudden, i.e. abruptness or brevity. To define sudden as meaning only unexpected or unintended, and therefore as a mere restatement of accidental, would render the suddenness requirement mere surplusage."
942 F.2d 189, 192 (3d Cir.1991) (quoting Lower Paxton Township v. United States Fidelity & Guar. Co., 383 Pa.Super. 558, 557 A.2d 393, 402 (1989)). As expressed in the pollution exclusion clause, the word sudden means abrupt and unexpected.[5]
We reject Dimmitt's suggestion that the policy is ambiguous because the term accident is included both within the definition of occurrence and in the pollution exclusion provision.[6] We concur with the response to this *705 argument stated in United States Fidelity & Guaranty Co. v. Star Fire Coals, Inc., 856 F.2d 31, 34 (6th Cir.1988):
We do not find the pollution clause to be riddled with ambiguities despite the best efforts of Star Fire to create them. Specifically, we believe the district court erred when it treated the pollution exclusion and the "occurrence" definition provisions as interchangeable. Though the district court recognized that the issue before it was "whether Star Fire's release of coal dust falls within the policy exclusion provision," the court failed to explicate the language of the exclusion and ruled in favor of Star Fire on the basis of the "occurrence" definition. We have no difficulty reconciling the two provisions. We believe the "occurrence" definition results in a policy that provides coverage for continuous or repeated exposure to conditions causing damages in all cases except those involving pollution, where coverage is limited to those situations where the discharge was "sudden and accidental." We fully agree with the conclusion that this "language is clear and plain, something only a lawyer's ingenuity could make ambiguous." American Motorists Insurance Co. v. General Host Corp., 667 F. Supp. 1423 (D.Kan. 1987). "It's strange logic to perceive ambiguity" in this clause. Waste Management of Carolinas, Inc. v. Peerless Insurance Co., 315 N.C. 688, 340 S.E.2d 374 (1986).
In the final analysis, we construe this policy to mean that (1) basic coverage arises from the occurrence of unintended damages, but (2) such damages as arise from the discharge of various pollutants are excluded from the basic coverage, except that (3) damages arising from the discharge of these pollutants will fall within the coverage of the policy where such discharge is sudden and accidental. See Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153 (4th Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 78, 121 L.Ed.2d 42 (1992).
Because we conclude that the policy language is unambiguous, we find it inappropriate and unnecessary to consider the arguments pertaining to the drafting history of the pollution exclusion clause.
Applying the policy language to the facts of this case, we hold that the pollution damage was not within the scope of Southeastern's policy. The pollution took place over a period of many years and most of it occurred gradually. With respect to the pollution which resulted from oil spills and leaks at the site as well as from occasional runoff of contaminated rain water, we agree with the analysis of the federal district judge in this case when he said:
These spills and leaks appear to be common place events which occurred in the course of daily business, and therefore cannot, as a matter of law, be classified as "sudden and accidental." That is, these "occasional accidental spills" are recurring events that took place in the usual course of recycling the oil. As one court observed: "contamination ... by disposing of chemicals in the lagoon, or by annual careless spillage onto the ground surface cannot be sudden, or unexpected and accidental ..." American Mutual Liability Ins. v. Neville Chemical, 650 F. Supp. 929, 933 (W.D.Pa. 1987); Grant-Southern Iron & Metal Co. v. CNA Insurance Co., 669 F. Supp. 798 (E.D.Mich. 1986) (polluting air emissions caused by the sporadic or continuous break down of pollution equipment were not sudden and accidental).
Industrial Indem. Ins. v. Crown Auto Dealerships, 731 F. Supp. 1517, 1521 (M.D.Fla. 1990). See also Lumbermens Mut. Casualty *706 Co. v. Belleville Indus., Inc., 407 Mass. 675, 555 N.E.2d 568 (1990).
We answer the certified question in the affirmative and return the record to the Eleventh Circuit.
It is so ordered.
McDONALD, SHAW and KOGAN and HARDING, JJ., concur.
GRIMES, J., concurs with an opinion.
OVERTON, J., dissents with an opinion, in which BARKETT, C.J. and HARDING, J., concur.
GRIMES, Justice, concurring.
I originally concurred with the position of the dissenters in this case. I have now become convinced that I relied too much on what was said to be the drafting history of the pollution exclusion clause and perhaps subconsciously upon the social premise that I would rather have insurance companies cover these losses rather than parties such as Dimmitt who did not actually cause the pollution damage. In so doing, I departed from the basic rule of interpretation that language should be given its plain and ordinary meaning. Try as I will, I cannot wrench the words "sudden and accidental" to mean "gradual and accidental," which must be done in order to provide coverage in this case.
OVERTON, Justice, dissenting.
I dissent. In my view, the majority: (1) ignores key factors in determining that the term "sudden and accidental," as used in comprehensive liability insurance policies, is not ambiguous; (2) fails to consider the facts in this record concerning the intent of the insurance industry in using that term and, consequently, is wrong on the merits; and (3) allows the insurance industry to grossly abuse the rehearing process in the presentation of its rehearing petition in this cause.

The Definition of "Sudden and Accidental"
The majority's reasoning blatantly ignores evidence before this Court reflecting that the term "sudden and accidental" is ambiguous. The term "sudden and accidental" has been in use by the insurance industry in standard form insurance policies since before 1970. In those policies, "sudden and accidental" has been defined differently from the definition asserted in this case by Southeastern. For instance, in policies involving boilers and machinery, courts have uniformly found the term "sudden and accidental" to be defined as "unforeseen or unexpected" (the definition asserted by Dimmitt), as opposed to "instantaneous or abrupt" (the definition asserted by Southeastern). The law is clear and unrefuted on this point.[7] In explaining the meaning of "sudden and accidental" in boiler and machinery policies, one treatise states the following:
In order for the insured to recover under a boiler and machinery policy it must demonstrate that the occurrence was "sudden and accidental." Although the terms "sudden" and "accidental" seem to imply that the immediate or instantaneous event must occur, courts have construed these terms more broadly. Utilizing the "common meaning" doctrine, the courts have uniformly held that the dictionary definition *707 of the terms as "unforeseen, unexpected and unintentional" is controlling.
Stephen A. Cozen, Insuring Real Property, § 5.03(2)(b) (1989) (footnotes omitted). Similarly, Professor Couch in his treatise states the following:
When coverage is limited to a sudden "breaking" of machinery the word "sudden" should be given its primary meaning as a happening without previous notice, or as something coming or occurring unexpectedly, as unforeseen or unprepared for. That is, "sudden" is not to be construed as synonymous with instantaneous.

George J. Couch, 10A Couch on Ins. Law 2d § 42:396 (rev. ed. 1982) (footnotes omitted) (emphasis added). In fact, in one case three separate failures of one motor over a seven-month period were found to be "sudden and accidental." Community Fed. Sav. & Loan Ass'n v. Hartford Steam Boiler Inspection & Ins. Co., 580 F. Supp. 1170 (E.D.Mo. 1984). The simple fact that the term "sudden and accidental" has been defined differently in other insurance policies is sufficient to support a finding of ambiguity as to the term's definition here. For the majority to assert otherwise, in my view, defies logic and common sense and is legally unjustified. A majority of other state supreme courts that have considered this issue agree with my position. See Hecla Mining Co. v. New Hampshire Ins. Co., 811 P.2d 1083 (Colo. 1991); Claussen v. Aetna Casualty & Sur. Co., 259 Ga. 333, 380 S.E.2d 686 (1989); Outboard Marine Corp. v. Liberty Mut. Ins. Co., 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992); Joy Technologies, Inc. v. Liberty Mut. Ins. Co., 187 W. Va. 742, 421 S.E.2d 493 (1992); Just v. Land Reclamation, Ltd., 155 Wis.2d 737, 157 Wis.2d 507, 456 N.W.2d 570 (1990).
In determining whether the term was ambiguous, the Wisconsin Supreme Court recognized that even dictionaries differ on the meaning of the term "sudden." That court noted that Webster's Third New International Dictionary (1986) gives the primary meaning of "sudden" as "occurring unexpectedly ... not foreseen," and a secondary meaning as "prompt," whereas the Random House Dictionary gives the primary meaning as "happening, coming, made, or done quickly." 456 N.W.2d at 573. Random House gives "sudden" the secondary meaning of "an unexpected occasion or occurrence." The Random House Dictionary of the English Language (2d ed. 1987).
The Georgia Supreme Court likewise noted the differences in the definition of that term and the variances of its primary and secondary meanings in the dictionaries, stating: "But, on reflection one realizes that even in its popular usage, `sudden' does not usually describe the duration of an event, but rather its unexpectedness: a sudden storm, a sudden turn in the road, sudden death." Claussen, 380 S.E.2d at 688. The court explained that "[e]ven when used to describe the onset of the event, the word has an elastic temporal connotation that varies with expectations." Id.
In my view, the term "sudden and accidental" must be found to be ambiguous given that the term is, in fact, subject to more than one interpretation. Although the insurance industry asks that we find the term to be unambiguous, it is clear that the term can mean "unexpected and unintended," a definition not limited as to time of occurrence, in addition to Southeastern's asserted definition of "instantaneous or abrupt." This is especially true when considering the extreme divergence among the numerous jurisdictions considering this issue. As noted, even dictionaries cannot agree as to the primary and secondary meanings of the word "sudden." Notably, however, perhaps the most important illustration of this ambiguity is the definition that the insurance industry itself embraced in regulatory presentations. An examination of the pollution exclusion clause drafting history set forth below unquestionably supports the conclusion that the clause was included only to preclude coverage for intentionally caused pollution damage, not to preclude damage that was "unexpected and unintended."

The Drafting History of Comprehensive General Liability Policies and the Pollution Exclusion Clause
Comprehensive general liability (CGL) policies are standard insurance policies developed *708 by insurance industry trade associations, and these policies are the primary form of commercial insurance coverage obtained by businesses throughout the country. CGL policies have been revised in pertinent part on three separate occasions: first in 1966, then again in the early 1970s and mid-1980s.[8]Just, 456 N.W.2d at 573-74; Brooke Jackson, Liability Insurance for Pollution Claims: Avoiding a Litigation Wasteland, 26 Tulsa L.J. 209, 224 (1990). The pollution exclusion clause, the clause at issue in this proceeding, was included as a standard clause in CGL policies in the 1970s revision. Id.; Stephen L. Liebo, 7A Appleman's Insurance Law and Practice § 4499.05 (Supp. 1991).
Before 1966, the standard comprehensive general liability policy covered only property and personal injury damage that was caused by "accident." Broadwell Realty Servs., Inc. v. Fidelity & Casualty Co. of New York, 218 N.J. Super. 516, 528 A.2d 76, 84 (1987); Just, 456 N.W.2d at 574. The term "accident" was undefined in policies, and courts reached differing conclusions as to exactly what type of damage was covered. In defining the term "accident," most courts agreed that the term referred to damage caused by an unintentional or unexpected event. But some found that damage caused by gradual pollution was covered, while others did not. Just, 456 N.W.2d at 574.
To clarify this confusion, in 1966 the insurance industry switched from "accidentbased" comprehensive general liability policies to "occurrence-based" policies. Kenneth S. Abraham, Environmental Liability Insurance Law 155 (1991). In the occurrence-based comprehensive general liability policy, the term "occurrence" was defined as "`an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.'" Broadwell, 528 A.2d at 84 (emphasis added) (quoting 3 Rowland H. Long, The Law of Liability Insurance App-53 (1966)).
Statements by the insurance industry at that time indicate that the shift to an occurrence-based CGL policy was to "clarify the coverage provided by liability policies, and to avoid the confusion resulting from courts attempting to distinguish between accidental means and accidental results." Grand River Lime Co. v. Ohio Casualty Ins. Co., 32 Ohio App.2d 178, 289 N.E.2d 360, 364 (1972). Additionally, the shift was to clearly indicate that the term "occurrence" included damages caused by "`exposure to conditions which may [have] continue[d] for an unmeasured period of time.'" Broadwell, 528 A.2d at 84 (quoting 3 Rowland H. Long, The Law of Liability Insurance App-53 (1966)). For instance, Lyman Baldwin, Secretary-Under-writing, Insurance Company of North America, made this statement regarding coverage:
"Let us consider how this would apply in a fairly commonplace situation where we have a chemical manufacturing plant, which, during the course of its operations, emits noxious fumes that damage the paint on buildings in the surrounding neighborhood. Under the new [occurrence-based] policy, there is coverage until such time as the insured becomes aware that the damage was being done."
Just, 456 N.W.2d at 574 (quoting George Pendygraft, et al., Who Pays for Environmental Damage: Recent Developments in CERCLA Liability and Insurance Coverage Litigation, 21 Ind.L.Rev. 117, 141 (1988)).
On March 17, 1970, the industry again proposed to amend CGL policies to include the pollution exclusion clause at issue in Dimmitt. When the pollution exclusion clause was proposed, representatives of the industry indicated that the new clause was not designed to reduce coverage; instead, it was to ensure that insureds who recklessly and intentionally polluted or who failed to take reasonable precautions to prevent pollution would not be afforded coverage. For example, the Insurance Rating Board stated:
"Coverage for pollution or contamination is not provided in most cases under present *709 policies because damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above exclusion clarifies this situation so as to avoid any question of intent. Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident. ..."
Just, 456 N.W.2d at 575 (emphasis added) (quoting James T. Price, Evidence Supporting Policyholders in Insurance Coverage Disputes, Nat. Resources & Env't, Spring 1988, at 17, 48). Emphasizing the view that it was not intended to reduce coverage, The Fire, Casualty & Surety Bulletin, a bulletin used by insurance agents and brokers in interpreting policy provisions, stated:
"In one important respect, the exclusion simply reinforces the definition of occurrence. That is, the policy states that it will not cover claims where the `damage was expected or intended' by the insured and the exclusion states, in effect, that the policy will cover incidents which are sudden and accidental  unexpected and not intended."
Just, 456 N.W.2d at 575 (emphasis added) (quoting Sheldon Hurwitz & Dan D. Kohane, The Love Canal  Insurance Coverage for Environmental Accidents, 50 Ins.Couns.J. 378, 379 (1983)).
In determining whether to approve the new clause, the West Virginia insurance commissioner held a hearing to determine the meaning of the term "sudden and accidental." The commissioner's concern was that the clause would reduce coverage but not reduce rates. At the conclusion of the hearing, the hearing officer made the following findings:
The [insurance] companies and rating organizations have represented to the Insurance Commissioner, orally and in writing, that the proposed exclusions .. . are merely clarifications of existing coverages as defined and limited in the definitions of the term `occurrence', contained in the respective policies to which said exclusions would be attached.
In re Pollution and Contamination Exclusion Findings, W. Va. Dept. of Ins. Order 704 (August 19, 1970). The Supreme Court of West Virginia recently addressed the issue and stated the insurance industry had engaged "in studied, affirmative and official communications with a regulatory authority of the State of West Virginia." Joy Technologies, 421 S.E.2d at 497. In those communications,
the insurance group representing [the insurer in the case at issue] unambiguously and officially represented to the West Virginia Insurance Commission that the exclusion in question did not alter coverage under the policies involved, coverage which included the injuries in the present case. This Court must conclude that the policies issued by [the insurer] covered pollution damage, even if it resulted over a period of time and was gradual, so long as it was not expected or intended.

Id. at 499-50 (emphasis added).
The Supreme Court of Georgia in its decision noted that the insurance rating board made similar representations to its insurance commissioner by stating that the pollution exclusion clause was intended to shut out only intentional polluters. Claussen, 380 S.E.2d at 689. Additionally, the board stated that the clause's inclusion would have no effect on the vast majority of risks. Id.
Likewise, the State of Florida, as an amicus curiae in this cause, has asserted that representations similar to those made to West Virginia's insurance commissioner were made to it at the time the industry sought approval of the clause in Florida. The State additionally noted that, had insurers submitted the clause as one limiting coverage, Florida and other states would likely not have approved the clause without a simultaneous rate reduction.
The drafting history of the pollution exclusion clause leads to the inescapable conclusion that the insurance industry was attempting to exclude from coverage those polluters who committed their acts intentionally. The record of representations by the insurance industry itself clearly support this conclusion. The addition of the pollution exclusion clause, specifically the term "sudden and accidental" was presented by the insurance industries to *710 the regulators to mean that coverage would continue for those events that were "unexpected and unintended"; the clause's purpose was simply to make clear that intentionally committed pollution would not be covered.
Four state supreme courts have construed the term "sudden and accidental" to be clear and unambiguous, holding that the common, everyday understanding of the term "sudden" is a happening done quickly, without warning, unexpectedly, or abruptly. Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc., 407 Mass. 675, 555 N.E.2d 568 (1990); Upjohn Co. v. New Hampshire Ins. Co., 438 Mich. 197, 476 N.W.2d 392 (1991); Waste Management, Inc. v. Peerless Ins. Co., 315 N.C. 688, 340 S.E.2d 374 (1986); Hybud Equip. Corp. v. Sphere Drake Ins. Co., 64 Ohio St.3d 657, 597 N.E.2d 1096 (1992). None of these courts, however, have addressed representations by the industry regarding its intentions in including the term "sudden and accidental" in the pollution exclusion clause and none have acknowledged that the industry itself has construed and applied this term differently in other insurance policies. In my view, the failure to consider these representations in determining the meaning of "sudden and accidental" is unjustified. I would hold that the insurance industry contemplated no change in coverage except in those instances where damage was caused by intentionally committed acts of pollution, and, consequently, that "unexpected and unintentional" damage is covered under the term "sudden and accidental."
Interestingly, even though the Massachusetts Supreme Court in Lumbermens held that "sudden and accidental" had a temporal meaning, its consideration of that term in a later case would still require that the summary judgment in the instant case be reversed and remanded. In Goodman v. Aetna Casualty & Surety Co., 412 Mass. 807, 593 N.E.2d 233 (1992), the Massachusetts Supreme Court reviewed a case in which the damage at issue under the pollution exclusion clause was caused by a gradual leak. Damage caused as a result of the leak occurred over an eighteen-month period of time. The trial court, based on Lumbermens, had issued summary judgment in favor of the insurer, finding that an eighteen-month leak was not "sudden and accidental." The Supreme Court reversed and remanded that determination, stating that the issue of whether the damage was sudden and accidental turned on how the accident itself occurred rather than whether the damage caused by the accident was sudden and accidental. For instance, if the leak was caused by a sudden and accidental puncture, then the damage resulting from that leak was covered under the policy even if the damage itself occurred over a long period to time. Under this rationale, it would still be necessary to remand the instant case for a determination of whether the damage at issue was sudden and accidental.[9]

Improper Grounds for Granting Rehearing
Finally, I believe that the majority's opinion allows Southeastern to grossly abuse the rehearing process because the contents of the petition for rehearing in this case are improper. Under Florida Rule of Appellate Procedure 9.330, a motion for rehearing shall not be used to re-argue the merits of a court's decision. In this case not only does Southeastern totally reargue legal issues previously considered by this Court, it also seeks to improperly present "newly discovered evidence." Southeastern contends that its "new" evidence is admissible to rebut extrinsic evidence submitted by Dimmitt.
I would strike Southeastern's "new evidence" for two reasons. First, the evidence submitted by Dimmitt was properly made part of the record in this proceeding. The Circuit Court for the Eleventh Circuit specifically noted that the record in this case properly included extrinsic evidence submitted by Dimmitt Chevrolet regarding the drafting history of the pollution exclusion clause and the intent of the insurance companies. It further noted that Southeastern had an opportunity *711 to respond to the evidence submitted by Dimmitt. It stated:
We conclude that the record properly includes the extrinsic evidence submitted by Dimmitt regarding the drafting history of the pollution exclusion clause and the intent of the insurance companies. Appellee argues that such extrinsic evidence is not properly a part of the record on appeal because much of it was proffered with the post-trial motion to alter or amend and was thus untimely. Under the circumstances of this case, it was appropriate for Dimmitt to proffer the evidence in connection with the motion to alter or amend. The district court ruled that the evidence was discoverable in a February 8, 1990 order. The parties' pretrial stipulation contemplated that the issue of admissibility of the evidence would be decided at a motion in limine. However, the district court granted summary judgment prior to the date set for trial. Dimmitt reasonably planned to argue for admissibility of the evidence at a motion in limine, rather than in a supplemental brief in connection with the pending summary judgment motions, because the district court's February 8, 1990 order denied motions by certain other auto dealerships to file supplemental briefs in support of their cross-motions for summary judgment. Furthermore, Southeastern had an opportunity to respond to the extrinsic evidence, and in fact did respond, in their Memorandum in Opposition to Defendant's Motion to Alter or Amend Judgment. Finally, at least some of the evidence was discussed in opinions cited by the district court in its order granting summary judgment. See, e.g., Claussen v. Aetna Cas. & Sur. Co., 259 Ga. 333, 380 S.E.2d 686 (1989).
Industrial Indem. Ins. Co. v. Crown Auto Dealerships, Inc., 935 F.2d 240, 243 n. 3 (11th Cir.1991) (references to record omitted). Consequently, the extrinsic evidence submitted by Dimmitt may properly be considered by this Court.
Second, the evidence Southeastern now asks this Court to consider is not new  it is a drafting and regulatory history of the policy at issue as compiled by Transamerica Insurance Company. Transamerica sought to file this history in an amicus brief in this proceeding. However, the brief was late-filed and was rejected by this Court. Southeastern now seeks to admit Transamerica's compilation by incorporating that compilation into its rehearing petition, claiming it is "new evidence." This history was readily available to Southeastern during the course of this proceeding, and it is improper to allow them to circumvent procedural rules of this Court by permitting submission of that evidence at this time.
Given that the evidence being submitted by Southeastern is now inadmissible and given that a significant portion of Southeastern's argument in the petition makes reference to that evidence, I believe that the rehearing petition is improper under the rules and should be stricken. Consideration of the rehearing petition in its present form makes a mockery of the rehearing rule and effectively signals the bar that "anything goes." Apparently, the insurance industry has sought a proverbial second bite at the apple and won.
BARKETT, C.J., and HARDING, J., concur.
The Motion for Rehearing and Clarification, filed by Appellant, is hereby denied.
McDONALD, SHAW, GRIMES and KOGAN, JJ., concur.
OVERTON, J., dissents with an opinion, in which BARKETT, C.J. and HARDING, J., concur.
OVERTON, Justice, dissenting from order denying rehearing.
I would grant Dimmitt's motion for rehearing and apply the doctrine of estoppel to Southeastern's denial of coverage for the reasons articulated in the New Jersey Supreme Court's unanimous decision in Morton International, Inc. v. General Accident Insurance Co. of America, 134 N.J. 1, 629 A.2d 831 (1993), which was released three weeks after our decision in this case issued on July 1, 1993. Under the majority opinion, small business entities are the losers and the insurance *712 industry is the winner in this major question of environmental liability coverage.
In rendering its decision, the majority has chosen to ignore the deceptive conduct of the insurance industry; ignore the windfall profits that will be derived by the insurance industry from premiums collected for coverage that the industry asserts is no longer provided despite the industry's previous assertions to the contrary; and ignore the fact that the majority of state supreme courts that have considered this issue have interpreted it in favor of coverage. See Hecla Mining Co. v. New Hampshire Ins. Co., 811 P.2d 1083 (Colo. 1991); Claussen v. Aetna Casualty & Sur. Co., 259 Ga. 333, 380 S.E.2d 686 (1989); Outboard Marine Corp. v. Liberty Mut. Ins. Co., 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992); Morton; Joy Technologies, Inc. v. Liberty Mut. Ins. Co., 187 W. Va. 742, 421 S.E.2d 493 (1992); Just v. Land Reclamation, Ltd., 155 Wis.2d 737, 157 Wis.2d 507, 456 N.W.2d 570 (1990). Further, and equally as important, the majority totally ignores the fact that the insurance industry is now obtaining from this Court what that industry sought but was unable to obtain from the Florida Department of Insurance in 1984.
To emphasize that my characterization of the insurance industry's conduct as deceptive is reasonable and supportable, I find it appropriate to quote extensively from the New Jersey Supreme Court's well-articulated analysis of the industry's conduct in Morton:
[T]he IRB and the Mutual Insurance Rating Bureau (MIRB) sought state regulatory approval to add the pollution-exclusion clause as an endorsement to standard CGL policies, apparently submitting to most if not all states in which approval was sought a standard explanatory memorandum that read in part as follows:
Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above exclusion clarifies this situation so as to avoid any question of intent. Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident * * *.
As the record indicates, the identical explanatory memorandum was filed by the IRB with the New Jersey Department of Insurance in May 1970. The Attorney General's amicus brief observes that the industry's submission of the pollution-exclusion clause and its approval by the Department of Insurance were specifically required by New Jersey's statutory provisions regulating rates for insurance coverage, N.J.S.A. 17:29A-1 to -28, although no rate change was sought with respect to the pollution-exclusion clause. We take note of other provisions of the insurance statutes that require approval of commercial-insurance policy provisions in order to prevent the issuance of policy forms that are inequitable or misleading. See N.J.S.A. 17:29AA-11. We assume that most states had in effect comparable regulatory provisions that mandated the submission of the pollution-exclusion clause for state approval.
In considering the IRB's explanatory memorandum concerning the effect of the pollution-exclusion clause  which the record suggests was the only explanation offered to New Jersey insurance officials  we accord special significance to the process by which that clause gained approval in New Jersey and other states. Realistically, once the clause gained regulatory approval, it was uniformly adopted as an endorsement to the standard-form CGL policies that were issued to innumerable commercial enterprises and governmental agencies for more than a decade. The abundant case law called to our attention by counsel for all parties may be regarded merely as an illustrative sample of the virtually universal inclusion of the standard clause, or one of its derivatives, in CGL policies issued throughout the United States. Of course, after regulatory approval the specific provisions of the pollution-exclusion clause ordinarily were not negotiable by purchasers of CGL policies. As some commentators observe, the typical commercial insured rarely sees the policy *713 form until after the premium has been paid. Accordingly, to the extent that the pollution-exclusion clause ever was subjected to arms-length evaluation by interests adverse to the insurance industry, that evaluation occurred only when the clause was submitted to and reviewed by state regulatory authorities.
In considering the accuracy of the IRB's explanatory memorandum, we note that the insurance companies in this litigation, and in general, assert the position that the pollution-exclusion clause precludes coverage for all pollution damage, whether or not intended, unless the discharge of pollutants was "sudden" (meaning abrupt) and "accidental," or a so-called "boom" event. That being the industry's understanding of the effect of the pollution-exclusion clause, the first two sentences of the explanatory memorandum to state regulators are, to say the least, paradigms of understatement:
Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above exclusion clarifies this situation so as to avoid any question of intent.
The first sentence is simply untrue... .
... .
In the context of the generally-recognized broad coverage afforded by the pre-existing "occurrence" policies for property damage caused by pollution, the industry's statement that "such coverage is not provided in most cases under present policies" is not only astonishing but inaccurate and misleading as well. As is widely acknowledged, even by commentators sympathetic to the insurers' position, the industry's primary concern in 1970 was that the occurrence-based policies "seemed tailor made to extend coverage to most pollution situations."
The second sentence is even more misleading than the first. It states that "[t]he above exclusion clarifies this situation so as to avoid any question of intent," undoubtedly referring back to the immediately preceding clause that reads "because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence." Undeniably, the pollution-exclusion clause does "avoid any question of intent" because the clause excludes all coverage for unintentional pollution damage except for that caused by sudden and accidental discharges. But to characterize so monumental a reduction in coverage as one that "clarifies this situation" simply is indefensible. Stated accurately, the pollution-exclusion clause, as construed today by the industry, eliminates all coverage for unintended pollution-caused damage that the occurrence-based policy had provided, except for the unusual "boom-event" type case in which the discharge of the pollutants was both sudden  meaning abrupt  and accidental. To describe a reduction in coverage of that magnitude as a "clarification" not only is misleading, but comes perilously close to deception. Moreover, had the industry acknowledged the true scope of the proposed reduction in coverage, regulators would have been obligated to consider imposing a correlative reduction in rates.

The succeeding sentence of the explanatory memorandum continued to camouflage the literal effect of the pollution-exclusion clause: "Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident * * *." In asserting that coverage for pollution-caused injuries is "continued," the statement does not alert regulators to the critical change effected by the clause: under the occurrence-based policy, coverage was afforded if the property damage was accidental; under the pollution-exclusion clause, even if the property damage is accidental, no coverage is afforded unless the discharge of pollutants is both sudden and accidental. The memorandum utterly obscures that distinction, and the conclusion is virtually inescapable that the memorandum's lack of clarity was deliberate.

629 A.2d at 851-53 (citations omitted) (emphasis added). Given these findings regarding the history of the pollution exclusion *714 clause, the New Jersey Supreme Court refused to construe CGL policies in a manner consistent with the clause's literal language. As the Court noted, to so interpret CGL policies would (1) ignore the industry's misleading presentation to state regulators, (2) overlook the unfairness such an interpretation would impose on policyholders "who were charged rates that did not reflect the radical diminution in coverage contemplated by the insurance industry," (3) violate the strong public policy of requiring regulation of the insurance business in the public interest, and (4) reward the industry for its misrepresentation and nondisclosure to state regulatory authorities.
The State of Florida, as an amicus curiae in this cause, has asserted that representations similar to those made to the insurance commissioners of New Jersey, West Virginia, and Georgia, were made to the Florida Insurance Department at the time the insurance industry sought approval of the clause in Florida. I find that the record supports such a conclusion. See, e.g., letter submitted as part of the record in this proceeding as being representative of correspondence by the insurance industry to the Florida Department of Insurance, dated May 28, 1970, stating:
Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above exclusion clarifies this situation so as to avoid any question of intent. Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident... .

(Emphasis added.) This is the exact language that the Supreme Court of New Jersey classified as deceptive, misleading, and untrue due to the insurance industry's current position as to coverage under the pollution exclusion clause and the meaning of "sudden and accidental."
Given the representations the insurance industry made to Florida and other states, I agree with the New Jersey Supreme Court's conclusion that, as a matter of public policy, the Court should not allow the insurance industry to benefit from its misrepresentations and nondisclosures. To do so would essentially now reward insurance companies with windfall profits for nondisclosures and misrepresentations the insurance industry made to this State more than twenty years ago when it was seeking approval of the pollution-exclusion clause at issue here. As noted by the Florida Attorney General in his amicus brief to this Court:
[T]he important public policy of protecting Florida consumers from misleading coverage representations would be reduced to a sham if insurers were permitted to characterize the pollution exclusion as a mere clarification in order to obtain regulatory approval and then characterize it in court papers as a radical reduction in coverage 23 years later at the point of claim. To protect the integrity of Florida's regulatory scheme, insurers such as Southeastern should be held to the formal explanations originally made to the Florida Insurance Department, which represents the interests of Florida citizens in approving and reviewing form endorsements. The public policy of the state is entitled to no less weight than the identical public policy of the State of New Jersey.
Further, as previously noted, in 1984 the industry sought but was unable to obtain from the Department of Insurance the relief this Court now grants through its decision in this case. In that year, the insurance industry proposed what has been called an "absolute pollution exclusion clause." The proposed clause completely eliminated the term "sudden and accidental" and totally excluded coverage for pollution cleanup costs that arose from governmental directives. Kenneth S. Abraham, Environmental Liability Insurance Law 161 (1991). The Florida Department of Insurance specifically disapproved the proposed exclusion clause because the insurance industry was attempting to reduce coverage without providing for any corresponding reduction in premiums. As the Department of Insurance stated in rejecting the proposed clause: "Pollution coverage has long been an integral part of general liability policies, and it is the Department's *715 position that the best interest of the insurance-buying public is not being served by approval of a form which excludes this coverage." (Emphasis added.)
Clearly, throughout the years the Department of Insurance has believed that the insurance-buying public, particularly small business entities, were paying for and were protected by the coverage the majority now precludes. The majority has effectively overruled the Department of Insurance's 1984 decision to disallow revocation of the coverage and has allowed the insurance industry to keep the profits charged for nonexistent coverage. It is clear to me that this decision could effectively ruin many small business owners who believed they had pollution coverage but now find that, in fact, they had no coverage.
In conclusion, I would follow the majority of the state supreme court decisions on this subject and would apply the estoppel rule of the New Jersey Supreme Court. I certainly would not allow the insurance industry to now benefit from its past misrepresentations and deceptions. Given the majority's decision in this case, the Legislature and the Department of Insurance should examine the feasibility of requiring the insurance industry to provide comprehensive pollution coverage in addition to requiring refunds to those citizens of this state who paid for pollution coverage they now find does not exist.
BARKETT, C.J., and HARDING, J., concur.
NOTES
[1] Hecla Mining Co. v. New Hampshire Ins. Co., 811 P.2d 1083 (Colo. 1991); Claussen v. Aetna Casualty & Sur. Co., 259 Ga. 333, 380 S.E.2d 686 (1989); Joy Technologies, Inc. v. Liberty Mut. Ins. Co., 187 W. Va. 742, 421 S.E.2d 493 (1992); Just v. Land Reclamation Ltd., 155 Wis.2d 737, 157 Wis.2d 507, 456 N.W.2d 570 (1990).
[2] Lumbermens Mut. Casualty v. Belleville Indus., Inc., 407 Mass. 675, 555 N.E.2d 568 (1990); Upjohn v. New Hampshire Ins. Co., 438 Mich. 197, 476 N.W.2d 392 (1991); Waste Management of the Carolinas, Inc. v. Peerless Ins. Co., 315 N.C. 688, 340 S.E.2d 374 (1986); Hybud Equip. Corp. v. Sphere Drake Ins. Co., 64 Ohio St.3d 657, 597 N.E.2d 1096 (1992).
[3] E.g., Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153 (4th Cir.) (construing New Jersey law), cert. denied, ___ U.S. ___, 113 S.Ct. 78, 121 L.Ed.2d 42 (1992); Aetna Casualty & Sur. Co. v. General Dynamics Corp., 968 F.2d 707 (8th Cir.1992) (construing Missouri law); Hartford Accident & Indem. Co. v. United States Fidelity & Guar. Co., 962 F.2d 1484 (10th Cir.) (construing Utah law), cert. denied, ___ U.S. ___, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992); Northern Ins. Co. v. Aardvark Assocs., 942 F.2d 189 (3d Cir.1991) (construing Pennsylvania law); A. Johnson & Co. v. Aetna Casualty & Sur. Co., 933 F.2d 66 (1st Cir.1991) (construing Maine law); New York v. AMRO Realty Corp., 936 F.2d 1420 (2d Cir.1991) (construing New York law); FL Aerospace v. Aetna Casualty & Sur. Co., 897 F.2d 214 (6th Cir.) (construing Michigan law), cert. denied, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990); United States Fidelity & Guar. Co. v. Murray Ohio Mfg. Co., 875 F.2d 868 (6th Cir.1989) (construing Tennessee law by affirming without opinion 693 F. Supp. 617 (M.D.Tenn. 1988)); United States Fidelity & Guar. Co. v. Star Fire Coals, Inc., 856 F.2d 31 (6th Cir.1988) (construing Kentucky law); Great Lakes Container Corp. v. National Union Fire Ins. Co., 727 F.2d 30 (1st Cir.1984) (construing New Hampshire law). Contra CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co., 962 F.2d 77 (1st Cir.1992) (also construing New Jersey law); New Castle County v. Hartford Accident & Indem. Co., 933 F.2d 1162 (3d Cir.1991) (construing Delaware law).
[4] See E. Joshua Rosenkranz, Note, The Pollution Exclusion Clause Through the Looking Glass, 74 Geo.L.J. 1237, 1240 (1986), in which the author laments that some courts have "ignored the insurers' intent and distorted the phrase `sudden and accidental' beyond recognition." He states that "courts have extended the coverage of policies containing the pollution exclusion `to mean just what they choose it to mean.'" Id.
[5] Our conclusion that sudden has a temporal dimension when used in conjunction with the term accidental is consistent with this Court's precedent in construing the statutory definition of sudden accident in workers' compensation cases. Spivey v. Battaglia Fruit Co., 138 So.2d 308 (Fla. 1962); Meehan v. Crowder, 158 Fla. 361, 28 So.2d 435 (1946).
[6] Likewise, we also reject the dissenters' argument that the term "sudden and accidental" in the pollution exclusion clause should be given the same interpretation as certain courts have construed the term in boiler and machinery policies. The most obvious flaw in this argument is that it ascribes universal meaning to the phrase "sudden and accidental" regardless of the context of its use. Significantly, boiler and machinery policies provide coverage for damage that is sudden and accidental; Southeastern's pollution exclusion applies the phrase to the causative agent  the discharge. Further, we note that the Massachusetts Supreme Court specifically rejected its own prior decision in New England Gas & Electric Ass'n v. Ocean Accident & Guarantee Corp., 330 Mass. 640, 116 N.E.2d 671 (1953), the lead case relied upon by the dissenters, as authority for compelling the sudden and accidental language in pollution exclusion clauses to be construed in the same manner as in boiler and machinery policies. Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc., 407 Mass. 675, 555 N.E.2d 568 (1990).
[7] See, e.g., New England Gas & Elec. Ass'n v. Ocean Accident & Guar. Corp., 330 Mass. 640, 116 N.E.2d 671, 680 (1953) (defining the word "sudden" within the term "sudden and accidental" in a boiler and machinery policy as "a happening without previous notice or with very brief notice, or as something coming or occurring unexpectedly, unforeseen, or unprepared for"); Anderson & Middleton Lumber Co. v. Lumbermens Mut. Casualty Co., 53 Wash.2d 404, 333 P.2d 938, 941 (1959) (the word "sudden" within the term "sudden and accidental" in boiler and machinery policy construed to mean "unforeseen and unexpected," not instantaneous"). See also Sutton Drilling Co. v. Universal Ins. Co., 335 F.2d 820, 824 (5th Cir.1964) (finding it was undisputed that the word "sudden," as used in oil well insurance policy, means "happening without previous notice or with very brief notice; unforeseen; rapid. It does not mean instantaneously."). After 1970, courts continued to similarly construe the term "sudden and accidental" in boiler and machinery policies. See, e.g., Community Fed. Sav. & Loan Ass'n v. Hartford Steam Boiler Inspection & Ins. Co., 580 F. Supp. 1170, 1173 (E.D.Mo. 1984) (three separate motor failures of one motor over a seven-month period found to be "sudden and accidental"); Cyclops Corp. v. Home Ins. Co., 352 F. Supp. 931, 934 (W.D.Pa. 1973) (relying on dictionary definition, court determined that "sudden" means "happening or coming unexpectedly").
[8] In 1984 the industry proposed what has been called an "absolute pollution exclusion clause." The new clause completely eliminates the term "sudden and accidental" and totally excludes coverage for pollution clean-up costs that arise from governmental directives. Kenneth S. Abraham, Environmental Liability Insurance Law 161 (1991).
[9] See, for example, the Circuit Court of Appeals' notation that at least some of the damage at issue was caused by a 1978 incident in which a dike collapsed and allowed oily wastewater to be released from a holding pond. Crown Auto, 935 F.2d at 241.