**ESSEX INSURANCE COMPANY,**
**Plaintiff,**

v.

**TRI–TOWN CORPORATION d/b/a**
**Rockland Rink, Defendant.**

**Civ. A. No. 92–12661–WGY.**

United States District Court,
D. Massachusetts.

July 20, 1994.

Anil Madan, Michaela F. Collins, Madan & Madan, Boston, MA, for plaintiff.

Henry A. Cashman, South Boston, MA, for defendant.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

These straightforward, undisputed facts set the stage for yet another look at one of the most frequently litigated exceptions (the pollution exclusion exception) found in a staple insurance industry product (the comprehensive general liability policy). Mid-morning, September 29, 1991—an ice hockey game is in progress at Rockland Rink in Abington, Massachusetts. Between the second and third periods of the hockey game, Rockland Rink resurfaces the ice for approximately ten minutes using its Zamboni. After the ice is resurfaced with the Zamboni, several hockey players, spectators, and referees complain of "physical effects" which they allege are "the result of exposure to carbon monoxide." (Agreed Facts, ¶ 10–18). The following day, the Zamboni is tested and emits "high concentrations of carbon monoxide." (Agreed Facts, ¶ 40). After an October 23, 1991 inspection of the premises at Rockland Rink's request, engineer Wilson G. Dobson renders the opinion that the Zamboni's catalytic converter caused "unacceptable levels of carbon monoxide to be discharged into the atmosphere." (Agreed Facts, ¶ 42).

At the time of the incident, Essex Insurance Company ("Essex") insured Tri–Town Corporation d/b/a Rockland Rink ("Rockland Rink") pursuant to a commercial general liability policy. Referee James Manning ("Manning"), hockey player Paul Sheerin, Jr., and spectators Paula and Stephen Glavin brought claims for injuries arising from the incident against Rockland Rink. Although Essex is defending Manning's claim against Rockland Rink in the Massachusetts Superior Court sitting in and for the County of Plymouth under a reservation of rights, it brings this action in federal court seeking a declaratory judgment that it has no obligation to Rockland Rink under its insurance contract as to claims arising from the inci-

dent. The parties have filed cross-motions for summary judgment.

Essex argues that it is not obligated to indemnify or defend Rockland Rink because the claims arising from this incident are excluded from coverage under the policy's Absolute Pollution Exclusion ("pollution exclusion"). The pollution exclusion provides in pertinent part:

**Exclusion—Absolute Pollution:**

It is agreed that this policy does not cover any claims arising out of:

    a. Bodily Injury, Personal Injury or Property Damage;

    . . . .

as a result of actual, alleged or threatened discharge, dispersal, release or escape of pollutants ... into or upon land, the atmosphere, or any water course ... whether such actual, alleged or threatened discharge, dispersal, release or escape or placement, is sudden, accidental, or gradual in nature.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, toxic chemicals or materials and waste.

(Agreed Facts, Exhibit A, at 9, ¶ 6).

It is undisputed that the claims arising from the incident are for personal injury. The parties disagree, however, as to whether the discharge of carbon monoxide from a faulty Zamboni is a "discharge, dispersal, release or escape of pollutants into ... the atmosphere," excluded from coverage under the Absolute Pollution Exclusion.

As in many other states, courts applying Massachusetts law have long wrestled with pollution exclusion clauses that were not "absolute" in that they excluded coverage only for pollution that was "sudden and accidental." *Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 751–53, 610 N.E.2d 912 (1993); *Goodman v. Aetna Cas. & Sur. Co.*, 412 Mass. 807, 811–13, 593 N.E.2d 233 (1992); *Liberty Mut. Ins. Co. v. SCA Services, Inc.*, 412 Mass. 330, 335–39, 588 N.E.2d 1346 (1992); *Lumbermens Mut. Cas. Co. v. Belleville Industries, Inc.*, 407 Mass. 675, 679–81, 555 N.E.2d 568 (1990); *Hazen Paper*

*Co. v. U.S. Fidelity and Guar. Co.*, 407 Mass. 689, 692, 555 N.E.2d 576 (1990); *Shapiro v. Public Service Mut. Ins. Co.*, 19 Mass.App. Ct. 648, 651–53, 477 N.E.2d 146, *review denied*, 395 Mass. 1102 & 1105, 480 N.E.2d 24 & 482 N.E.2d 328 (1985). *See Landauer, Inc. v. Liberty Mut. Ins. Co.*, 36 Mass.App. Ct. 177, 181–82, 628 N.E.2d 1300, *review denied*, 417 Mass. 1105, 635 N.E.2d 252 (1994); *Lumbermens Mut. Cas. Co. v. Belleville Industries, Inc.*, 938 F.2d 1423, 1427–30 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992); *In re Acushnet River & New Bedford Harbor*, 725 F.Supp. 1264, 1267–69 (D.Mass.1989). *See generally, Board of Regents of Univ. of Minnesota v. Royal Ins. Co. of America*, 517 N.W.2d 888 (Minn.1994); *Greenville County v. Insurance Reserve Fund*, 443 S.E.2d 552 (S.C.1994); *Morton Int'l Inc. v. General Accident Ins. Co. of America*, 134 N.J. 1, 629 A.2d 831 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994); *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal.App.4th 715, 15 Cal.Rptr.2d 815 (1993); *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Co.*, 636 So.2d 700 (Fla.1993); *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 64 Ohio St.3d 657, 597 N.E.2d 1096 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1585, 123 L.Ed.2d 152 (1993); *Joy Technologies, Inc. v. Liberty Mutual Ins. Co.*, 187 W.Va. 742, 421 S.E.2d 493 (1992); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992); *Borg–Warner Corp. v. Insurance Co. of North America*, 174 A.D.2d 24, 577 N.Y.S.2d 953 (1992), *leave to appeal denied*, 80 N.Y.2d 753, 587 N.Y.S.2d 905, 600 N.E.2d 632 (1992); *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 476 N.W.2d 392 (1991). Indeed, so hot was this topic at one time that it spawned litigation dealing with the drafting history of the exclusion. *See Lumbermens Mut. Cas. Co.*, 407 Mass. at 682–83, 555 N.E.2d 568 (refusing to consider drafting history of the pollution exclusion clause because the language—"sudden and accidental"—is unambiguous).

While institutions may move slowly, the insurance industry reacted with lightning speed to the possibility that its underwriting

calculations were seriously askew and it could find itself indemnifying industries facing the staggering retroactive pollution clean-up costs imposed by the 1980 enactment of the Comprehensive Environmental Response Compensation and Liability Act, Pub.L. No. 96–510, 94 Stat. 2767 (codified as amended at 42 U.S.C. § 9601 *et seq.* [1992]). In 1985, the insurance industry dropped the "sudden and accidental" qualifier in the standard pollution exclusion clause, thus rendering it "absolute." [1]

This industry-wide change raises a host of questions especially pertinent to the relationship between a company such as Essex and a small business insured such as Rockland Rink. Among those that immediately present themselves are: how long had Essex insured Rockland Rink under its comprehensive general liability policy? how, if at all, did it communicate its adoption of an absolute pollution exclusion to Rockland Rink? what insurance rate concessions were offered due to Essex' unilateral narrowing of its exposure? did Essex offer separate pollution insurance coverage? what is the role of the Massachusetts Insurance Commissioner in the premises? how have she and her predecessors discharged it? and what does the language of the absolute pollution exclusion clause mean here?

While all these questions are significant, raising as they do the proper scope of insurance industry regulation and the reach of Mass.Gen.L. ch. 93A, *see e.g., Dodd v. Commercial Union Ins. Co.,* 373 Mass. 72, 75–81, 365 N.E.2d 802 (1977), only the final question—the meaning of the clause in the present circumstances—is presented in this declaratory judgment action.

Although Massachusetts courts have not yet addressed absolute pollution exclusion clauses, the majority of courts that have reviewed the nearly identical language found therein throughout the fifty states have ruled them unambiguous and have thus enforced them in accordance with their plain language. *See, e.g., Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118 (2d Cir.1990); *Guilford*

*Indus. Inc. v. Liberty Mut. Ins. Co.,* 688 F.Supp. 792 (D.Me.1988), *aff'd,* 879 F.2d 853 (1st Cir.1989); *Vantage Dev. Corp. v. American Env't Technologies Corp.,* 251 N.J.Super. 516, 598 A.2d 948 (N.J.Super.Ct.Law Div. 1991); Mark D. Plevin, *Basics of Insurance Coverage Litigation, in* III Environmental Litigation 1165, 1173 (ALI–ABA, 1994) ("courts have, virtually without exception, enforced [the absolute pollution exclusion] as written"). *But see* David W. Steuber, Michael A. Rossi & Timothy M. Toyama, *Emerging Issues in Environmental Insurance Coverage Litigation, in* Toxic and Environmental Coverage Litigation (PLI Litig. & Admin.Practice Course Handbook Series No. H4–5185, 1994) (questioning whether absolute pollution exclusion clauses are really absolute).

Moreover, the Minnesota Court of Appeals has recently considered the applicability of an absolute pollution exclusion to facts virtually identical to those presented here. In *League of Minnesota Cities Ins. Trust v. City of Coon Rapids,* 446 N.W.2d 419 (Minn. Ct.App.1989), several individuals suffered lung injuries inside an ice arena due to the discharge of nitrogen dioxide from a Zamboni. The City of Coon Rapids argued that the pollution exclusion did not apply because the injuries were caused by several concurrent causes including poor ventilation and failure to monitor the air quality. Rejecting this argument, the court concluded "once the pollutant was introduced into the occurrence, coverage was properly denied." *Id.* at 421–22.

Here the individual claimants seek damages for injuries caused by the discharge of carbon monoxide from a malfunctioning Zamboni. Although the injuries may be attributable in part to other causes, i.e., the ventilation in the arena or the negligence of the person who installed the catalytic converter, this does not obligate Essex to indemnify Rockland Rink. Once the carbon monoxide was released into the atmosphere causing injuries, the incident fell within the scope of

---

1. More ominous in terms of the risk spreading that fosters economic growth, the insurance industry largely wrote off pollution insurance as unduly risky. Apparently there are today only two insurance companies that offer such insurance pursuant to a special rider.

the absolute pollution exclusion, and Essex' general indemnification obligation ceased.

Although the Court is troubled by what appears to be Essex' ability continually to limit the scope of coverage while constantly increasing premiums, the Court is bound to interpret and enforce contracts to which both parties freely agree in accordance with their plain language. As this Court was one of the first so to interpret the old version of the pollution exclusion language, *In re Acushnet River*, 725 F.Supp. at 1267–68; *see C.L. Hauthaway & Sons Corp. v. American Motorists Ins. Co.*, 712 F.Supp. 265, 267–69 (D.Mass.1989) (Harrington, J.) (same), so too it is now obligated to interpret this new "absolute" version. Based upon the unambiguous language of the policy, the Court declares that the discharge of pollutants from the Zamboni falls within the absolute pollution exclusion. Essex' Motion for Summary Judgment is, therefore, *ALLOWED*. Rockland Rink's Motion for Summary Judgment is *DENIED*.