SOUTHERN SOLVENTS, INC., Plaintiff,

v.

CANAL INSURANCE COMPANY, Defendant.

No. 94–533–CIV–T–24(E).

United States District Court,
M.D. Florida,
Tampa Division.

July 28, 1995.

William F. McGowan, Jr., Carlton, Fields, Ward, Emmanuel, Smith & Cutler, PA, Tampa, FL, C. Michael Johnson, Stephen T. La Briola, Joyce F. Mocek, Fellows, Johnson, Davis & La Briola, Atlanta, GA, for plaintiff Southern Solvents, Inc.

Andrew M. Brown, Macfarlane, Ausley, Ferguson & McMullen, Tampa, FL, James P. Schaller, Paul S. Schleifman, Maureen P. Kerrigan, Jackson & Campbell, P.C., Washington, DC, for defendants New Hampshire Ins. Co., Granite State Ins. Co.

F. Ronald Fraley (argued), Fraley & Fraley, P.A., Tampa, FL, Robert L. Dubé, Dubé & Wright, P.A., Miami, FL, for defendant Canal Ins. Co.

### ORDER

BUCKLEW, District Judge.

This Cause is before the Court on Defendant Canal Insurance Company's ("Canal") Motions for Summary Judgment (Doc. No.

53, filed May 10, 1995). Plaintiff filed a response on June 5, 1995 (Doc. No. 83) and a supplement to its response on June 28, 1995 (Doc. No. 100).

While one document, Defendant's petition contains four motions for summary judgment. The four motions allege: (1) the contamination was not "sudden and accidental," (2) Insured did not give notice as soon as practicable, (3) Plaintiff's misrepresentations in the application for insurance void the policy and (4) Insured breached the cooperation clause thus forfeiting coverage.

### Facts

This case arises out of an environmental clean-up dispute. The Plaintiff, Southern Solvents, began selling and distributing tetracholoroethene ("PERC") from its facilities at 4109 West Linebaugh Avenue, Tampa, Florida, in 1972. PERC is a dry-cleaning solvent used in the cleaning process of the dry-cleaning industry. Plaintiff delivered PERC on both a wholesale and retail level. Southern Solvents delivered PERC to retail dry-cleaning establishments in the Central Florida area via a 1,000 gallon truck. The truck would fill up with PERC from the permanent storage tanks located at the Linebaugh Avenue site. Southern Solvents also transported PERC from its manufacturers to other wholesale distributors of PERC via two 4,000 gallon tankers/semi-trailers. Operations at the Linebaugh site were discontinued at some point between 1984 and 1986.

At some point between the summer and fall of 1988, Southern Solvents was notified by its lessee, PJ Subs, that the Hillsborough County Health Department had found significant levels of PERC contamination in the groundwater at the Linebaugh site. Southern Solvents did not know the cause of the contamination and in December 1988, retained an environmental engineering company, Mortensen Engineering, Inc., to test and assess the groundwater contamination. Further investigation by Southern Solvents revealed that there had been four known releases of PERC at the Linebaugh site. These releases occurred on the following dates: August or September 1978, April 29, 1982, Summer of 1982, and July 16, 1983.

In January of 1989, Southern Solvents began discussions with the Florida Department of Environmental Regulation (the "Department") regarding the contamination. In August of 1989, Southern Solvents entered into a Consent Order with the Department.

During the relevant time periods, Southern Solvents maintained comprehensive general liability ("CGL") insurance as well as excess liability or umbrella liability insurance. Plaintiff's primary CGL insurer and automobile liability insurer were New Hampshire Insurance Company and Granite State Insurance Company (collectively the "AIG" companies). The primary policies from the AIG companies were of an "occurrence" type. These policies provided Plaintiff with a defense of all liabilities insured under the policy and indemnity limits of $100,000.00 annually for property damage.

Southern Solvent's umbrella liability carriers were Canal Insurance Company ("Canal"), Employers National Insurance Company ("Employers") and South American Insurance Company ("South American"). Both Employers and South American are in receivership. Canal provided occurrence-based umbrella liability coverage with umbrella liability indemnity limits of $1,000,000.00 for the period of May 18, 1982 to October 27, 1982. In October of 1982 the coverage was increased to $3,000,000.00. There is a dispute as to whether the increase was retroactive to May of 1982 or was effective October of 1982.

On March 15, 1989, Plaintiff notified its primary liability carriers, the AIG companies, of the environmental situation. Plaintiff subsequently notified the umbrella carrier Employers on April 29, 1992, and the umbrella carrier Canal on or before June 30, 1992. All carriers refused to defend or indemnify Plaintiff. Accordingly, Plaintiff initiated this breach of contract and declaratory judgment action against Defendants New Hampshire Insurance Company ("New Hampshire"), Granite State Insurance Company ("Granite State"), Canal and Employers on April 1, 1994. Mediation was held on February 23, 1995, and ultimately Defendants New Hampshire, Granite State and Employers settled and were dismissed. *See* Doc. No. 69.

## Summary Judgment Standard

The Eleventh Circuit recently discussed the standard for granting summary judgment:

Federal Rule of Civil Procedure 56(c) authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

*Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (1993), *reh'g and reh'g en banc denied*, 16 F.3d 1233 (11th Cir.1994).

The Eleventh Circuit recognized the seminal case concerning summary judgment, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), by highlighting the following passage:

[T]he plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Hairston*, 9 F.3d at 918.

Finally, the parties' respective burdens and the Court's responsibilities were outlined:

The party seeking summary judgment bears the initial burden to demonstrate to the district court the basis for its motion for summary judgment and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show an absence of any genuine issue of material fact. *Taylor v. Espy*, 816 F.Supp. 1553, 1556 (N.D.Ga. 1993) (citation omitted). In assessing whether the movant has met this burden, the district court must review the evidence and all factual inferences drawn therefrom, in the light most favorable to the non-moving party. *Welch v. Celotex* 951 F.2d 1235, 1237 (11th Cir.1992); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir.1987). If the movant successfully discharges its burden, the burden then shifts to the non-movant to establish, by going beyond the pleadings, that there exist genuine issues of material fact. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*[,] 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

Applicable substantive law will identify those facts that are material. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id.* For factual issues to be considered genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56. It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather determine whether such issues exist to be tried. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510. The Court must avoid weighing conflicting evidence or making credibility determinations. *Id.* at 255, 106 S.Ct. at 2513–14. Instead, "[t]he evidence of the non-movant is to be believed in his favor." *Id.* Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933–34 (11th Cir. 1989) (citation omitted).

*Id.* at 918–19. *See Mulhall v. Advance Sec. Inc.*, 19 F.3d 586, 589–90 (11th Cir.1994); *Howard v. BP Oil Co.*, 32 F.3d 520, 523–24 (11th Cir.1994).

## Discussion

### I. "Sudden and Accidental"

#### (a) The Parties' Arguments

Defendant contends that it owed Plaintiff no duty to defend or indemnify under the

insurance policy because the instant damages are excluded by the pollution exclusion clause of the policy.[1] Application of the Florida Supreme Court's definition of "sudden and accidental,"[2] Defendant argues, requires this Court to grant its motion for summary judgment. Defendant notes that the result is the same regardless of whether the Court analyzes the spills collectively or analyzes only the spill which occurred during the insurance coverage period.[3]

Defendant maintains that although Plaintiff has records of only four spills, the evidence suggests that the damages were a result of day-to-day or normal operations. Furthermore, Defendant argues, even if the spills or discharges were accidental, the continuous leaching thereafter and Plaintiff's decision not to implement immediate corrective action are the real reasons for the damages.

Plaintiff's response stresses the sudden, quick and unexpected nature of the four spills to conclude that the Defendant is obligated under the insurance policy. Plaintiff emphasizes that the four spills were not the result of day-to-day or normal operations, but were truly accidents. Plaintiff also states that while it had knowledge of the spills or discharges, it did not consider PERC to be a dangerous substance or a pollutant. Rather, it thought that due to the volatility of PERC, the PERC "would evaporate and go away and create no problems." Doc. No. 83, p. 7.

Having reviewed the file, taking all inferences in a light most favorable to the Plaintiff as non-movant, the Court finds that the four spills or discharges were separate and distinct events and not the result of day-to-day operations.[4] The Plaintiff was not a "pollution prone" polluter.[5] Accordingly, the spills are properly characterized as "sudden and accidental." However, merely characterizing the spills as "sudden and accidental" does not necessarily invoke coverage. Further analysis is needed to understand the relationship between the initial "sudden and accidental" discharge and the prolonged continuous leaching thereafter.

### (b) Burden of Proof

As previously noted, Plaintiff commenced this breach of contract, declaratory judgment action, and Defendant initiated this motion

---

**1.** The pollution exclusion clause and the "sudden and accidental" exception contained therein provide:

> It is agreed that this policy does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

**2.** Via a certified question from the Eleventh Circuit, the Florida Supreme Court in *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.*, 636 So.2d 700, 704 (Fla.1993), held that "sudden and accidental" was not ambiguous. The Florida Supreme Court defined sudden to include a temporal aspect, i.e. abruptness or brevity, and accidental to mean unexpected or unintended.

**3.** The third spill dated the summer of 1982 is the spill covered by Defendant's policy.

**4.** The Court stresses that this finding is based upon the limited evidence before it and the requirement that the Court view all inferences in a light most favorable to the non-movant. Thus, while record evidence exists which suggests that the claimed damages were not the result of only "four spills," but rather the result of Plaintiff's normal operations, *see* Doc. No. 53, p. 12–13, such evidence is insufficient in light of the summary judgment requirements.

**5.** A "pollution prone" polluter is one who emits pollutants on a daily basis. *Lumbermens Mut. Casualty Co. v. Belleville Indus.*, 938 F.2d 1423, 1427–28 (1st Cir.1991) (stating "[b]ut in the case of a pollution-prone operation, where the emission of pollutants is part and parcel of the daily conduct of business...."), *cert. denied, Belleville Indus. v. Lumbermens Mut. Casualty Co.*, 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992). *See also Nashua Corp. v. First State Ins. Co.*, 420 Mass. 196, 648 N.E.2d 1272 (1995) (denying coverage for a "chemical recycling" company because the releases of pollutants resulted from routine, continuous business practices); *Liberty Mut. Ins. Co. v. SCA Services, Inc.*, 412 Mass. 330, 588 N.E.2d 1346 (1991) (denying coverage for a "refuse collection" company because pollution occurred routinely, as part of its regular business activities).

For a more detailed analysis about pollution prone polluters see *Quaker State Minit–Lube v. Fireman's Fund Ins. Co.*, 868 F.Supp. 1278, 1318–24 (D.Utah 1994), *aff'd*, 52 F.3d 1522 (10th Cir.1995).

for summary judgment. The burden of proof is on the Plaintiff to prove that its claim falls within the "sudden and accidental" exception to the pollution exclusion clause. *Hudson Ins. Co. v. Double D Management Co., Inc.*, 768 F.Supp. 1549, 1551 (M.D.Fla.1991). Since the Defendant does not bear the burden of persuasion on the issue at trial, Defendant, as the moving party, discharges its burden on the motion for summary judgment by "showing" or "pointing" out that there is an absence of evidence to support Plaintiff's claim. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2553–54. Thus, Defendant must show that the evidence in the record is insufficient to support Plaintiff's claim that "sudden and accidental" exception applies. If Defendant discharges this burden, the Plaintiff must "go beyond the pleadings" to show that there is a genuine issue for trial.

### (c) Florida Law

■ The Florida Supreme Court has addressed the pollution exclusion clause and the "sudden and accidental" exception. In *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Inc. Corp.*, 636 So.2d 700 (Fla.1993), the court construed the policy "to mean that (1) basic coverage arises from the occurrence of unintended damages, but (2) such damages as arise from the discharge of various pollutants are excluded from the basic coverage, except that (3) damages arising from the discharge of these pollutants will fall within the coverage of the policy where such dis-

charge is sudden and accidental." *Id.* at 705 (citing *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153 (4th Cir.), *cert denied*, —— U.S. ——, 113 S.Ct. 78, 121 L.Ed.2d 42 (1992)). Discharges are "sudden and accidental" where they occur quickly, abruptly, unexpectedly and without notice. *Id.* at 704.[6]

The Florida Supreme Court held that where the pollution takes place over many years, or is the product of common place, daily events, the discharge cannot be classified as "sudden and accidental." *Id.* at 705. Such polluters are aptly called "pollution prone." [7]

The *Dimmitt* opinion is limited. The court merely found the "sudden and accidental" clause to be unambiguous, defining the terms to mean abrupt and unexpected. Additionally, the court held that where the damage is the result of continuous, day-to-day operations, i.e. a "pollution prone" polluter, then the insured cannot claim that the discharge was sudden and accidental. *Dimmitt*, 636 So.2d at 705. Damages for such discharges are barred by the pollution exclusion clause.

■ The opinion, however, did not address the situation where the initial discharge is characterized as "sudden and accidental," but the claimed damage is the result of the continuous prolonged leaching of the pollutants thereafter. This is precisely the issue before the Court. Are damages caused by continuous prolonged leaching excluded by the pollu-

---

**6.** The court stated,

> To read "sudden and accidental" to mean only unexpected and unintended is to rewrite the policy by excluding one important pollution coverage requirement—abruptness of the pollution discharge. The very use of the words "sudden and accidental" reveal [sic] a clear intent to define the words differently, stating two separate requirements. Reading "sudden" in its context, i.e. joined by the word "and" to the word "accident," the inescapable conclusion is that "sudden," even if including the concept of unexpectedness, also adds an additional element because "unexpectedness" is already expressed by "accident." This additional element is the temporal meaning of sudden, i.e. abruptness or brevity. To define sudden as meaning only unexpected or unintended, and therefore as a mere restatement of accidental, would render the suddenness requirement mere surplusage.

*Dimmitt*, 636 So.2d at 704 (quoting *Northern Ins. Co. v. Aardvark Assoc., Inc.*, 942 F.2d 189, 192 (3d Cir.1991) (quoting *Lower Paxon Township v. United States Fidelity & Guar. Co.*, 383 Pa.Super. 558, 557 A.2d 393, 402 (1989))).

**7.** The court in *Quaker State Minit–Lube v. Fireman's Fund Ins. Co.*, 868 F.Supp. 1278, 1318–24 (D.Utah 1994), *aff'd*, 52 F.3d 1522 (10th Cir. 1995), provided a detailed analysis of the problems of applying the "sudden and accidental" exception to "pollution prone" polluters. Problems arise when the polluter "attempts to 'break down its long term waste practices into temporal components.'" *Quaker State*, 868 F.Supp. at 1324 (quoting *Smith v. Hughes Aircraft Co.*, 10 F.3d 1448, 1453 (9th Cir.1993)). In such a situation, the polluter may identify "numerous releases which individually are abrupt or 'sudden,' but which taken together cannot fairly be said to be 'unexpected' or 'accidental.'" *Id.*

tion exclusion clause when the initial discharges were "sudden and accidental"?

Since the Florida Supreme Court's decision in *Dimmitt*, there have been two Florida cases addressing the "sudden and accidental" exception. *See Liberty Mut. Ins. Co. v. Lone Star Indus., Inc.*, 648 So.2d 114 (Fla.1994); *Matter of Celotex Corp.*, 175 B.R. 98 (Bkrtcy. M.D.Fla.1994). Unfortunately, neither of these decisions provide insight into the instant issue. In the face of this uncertainty, the Court makes its best *Erie* assessment.

### (d) Public Policy Concerns

The issue before the Court requires an examination of the public policy behind the pollution exclusion clause and the "sudden and accidental" exception. As previously noted, if the evidence had established that Plaintiff was a "pollution prone" polluter, then the *Dimmitt* opinion would mandate a finding that coverage was denied. The claimed damages would be the result of prolonged gradual pollution which could not be characterized as "sudden and accidental" because they could not be abrupt and unexpected. *See Dimmitt*, 636 So.2d at 705.[8] The reason for this conclusion, although not articulated by the Florida Supreme Court in *Dimmitt*, is to promote vigilance.

> We assume that an important policy consideration underlying environmental insurance (and CERCLA) is to encourage the mitigation and prevention of environmental damage caused by a pollutant discharge. **Interpreting sudden and accidental to preclude coverage for gradual, continuous contamination furthers that policy by encouraging potential polluters to monitor closely the disposition of their contaminants.** This is precisely why courts have never taken seriously the defense to liability that the "discovery" of contamination was "sudden." There is no valid policy reason to create an incentive for a polluter to look away and thereby

avoid liability by acts of willful blindness. **The pollution exclusion clause is based upon an environmental policy that prefers vigilance to negligence.**

*Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 840 F.Supp. 390, 394 (W.D.Pa.1993) (emphasis added) (citation omitted). The Court finds that this policy concern should apply even if the polluter is not "pollution prone." In other words, the policy goal of encouraging potential polluters to prevent and mitigate environmental damages caused by a pollutant discharge is furthered by barring coverage for pollution damages caused by continuous and prolonged leaching even though the initial discharge was "sudden and accidental" and even though the discharge was not the result of normal day-to-day operations. A polluter should be encouraged to take immediate corrective action, not rewarded for allowing pollutants to leach for several years. As the district court in *Smith v. Hughes Aircraft Co. Corp.*, 783 F.Supp. 1222, 1231 (D.Ariz.1991), *aff'd in part and rev'd in part*, 10 F.3d 1448 (9th Cir.1993), *opinion amended and superseded on denial of reh'g*, 22 F.3d 1432 (9th Cir.1993), noted, the polluter should face to "calamity" before turning to the insurer for coverage.

The holding in *Koppers* supports this conclusion. In *Koppers*, the district court discussed the meaning of the "sudden and accidental" exception and the policy behind it. Applying Pennsylvania law, the court stated that "damages resulting from a pollution discharge are covered only if the discharge itself is both sudden, **meaning abrupt and lasting only a short time,** and accidental, meaning unexpected." *Koppers*, 840 F.Supp. at 394 (emphasis added) (quoting *Lower Paxon Township v. United States Fidelity & Guar. Co.*, 383 Pa.Super. 558, 557 A.2d 393, 399 (1989)). The court then discussed the policy reasons behind the pollution exclusion clause as noted above.

---

8. Furthermore, the analysis in *Quaker State* would prevent this Court from breaking down the long term waste into temporal components. *Quaker State*, 868 F.Supp. at 1324 n. 79 (holding that proof of a nonrecurring "sudden and accidental" release should not operate "to extend coverage to property damage caused by a myriad

of more routine spills"); *see also Smith v. Hughes Aircraft Co.*, 10 F.3d 1448, 1453, *opinion amended and superseded on denial of reh'g*, 22 F.3d 1432 (9th Cir.1993); *Nashua Corp. v. First State Ins. Co.*, 420 Mass. 196, 648 N.E.2d 1272, 1275 (1995).

Stressing the "abrupt and lasting only a short time" requirement and the above public policy concerns, the *Koppers* court concluded that pollution damages caused by leaching, even if the discharge was abrupt, could never invoke coverage via the "sudden and accidental" exception because such a discharge fails "the lasting a short time" requirement.

In other words, assuming what Koppers speculates, that the drums simultaneously burst, or a landfill liner suddenly ruptured, or a flood occurred, we fail to see how the migration of the pollutants deep into the surrounding soil and groundwater could be characterized as lasting only a short time. The processes of leaching and contaminant migration ordinarily take considerable time.

*Id.* at 395.

The *Koppers* opinion is not the only opinion to stress public policy concerns. In *Smith v. Hughes Aircraft Co. Corp.*, 783 F.Supp. at 1230, the district court held that "'sudden' unmistakably connotes a temporal quality." The court concluded that the pollution exclusion clause "restricts coverage to accidents distinct in time and place." *Id.* (citing *United States Fidelity & Guar. v. Morrison Grain Co.*, 734 F.Supp. 437, 447 (D.Kan.1990)). In defending this definition, the court turned to public policy, stating:

Limiting coverage to "sudden" pollution, albeit accidental, increases the likelihood that such conduct was unintentional because it decreases likelihood that an insured will turn a blind eye toward negligent waste practices that, over time, poison the environment. In short, the provision excludes conduct that can be characterized as deliberate indifference that might otherwise constitute a covered occurrence. Coverage for such deliberate indifference, while not violative of public policy *per se*, certainly frustrates it.

An interpretation of "sudden" which includes a temporal component, therefore, does not preclude the coverage for "calamity" for which the insured seeks coverage.

**Indeed, it fairly ensures that the insured face such a calamity before turning to his insurers for coverage.**

*Id.* at 1231 (emphasis added) (citations omitted). On appeal the Ninth Circuit affirmed this portion of the district court's opinion, noting that defining "sudden" to include temporal brevity furthered public policy by excluding deliberate indifference on the part of the polluting insured. *Smith v. Hughes Aircraft, Co.*, 22 F.3d 1432, 1437 (9th Cir.1993).

The Court finds the rationale in the *Koppers* and *Smith* opinions persuasive. The underlying goal of the pollution exclusion clause (and environmental regulation in general) is to promote vigilance. Although the *Dimmitt* court did not expressly voice this goal, the court promoted it by holding that the "sudden and accidental" exception contains a temporal requirement which bars day-to-day "pollution prone" polluters from gaining coverage via the "sudden and accidental" exception.[9] In other words, "[i]nterpreting sudden and accidental to preclude coverage for gradual, continuous contamination furthers [the vigilance] policy by encouraging potential polluters to monitor closely the disposition of their contaminants." *Koppers*, 840 F.Supp. at 394. The Court finds that expanding the term "sudden" to mean lasting only a short time in addition to abrupt furthers this policy goal. Such a definition requires the potential polluter not only to monitor the disposition of their contaminants but also to take immediate corrective action following a discharge or release. In short, it promotes the polluter to face the "calamity" before turning to the insurer for coverage.

■ In the instant case, the first discharge occurred in August or September of 1978, the second on April 29, 1982, and the third in the summer of 1982. Although a consent decree was entered into in August of 1989, actual clean-up operations of the soil or groundwater have yet to be implemented. *See* Doc. No. 53, p. 6. Furthermore, according to Defendant's expert, Mr. Lukasik, there would be a continuous contamination from

---

9. The Court notes that the portion of the *Dimmitt* opinion defining "sudden" as abrupt and unexpected, *see supra* text accompanying note 6, cites to a Third Circuit opinion which in turn cites to

the Pennsylvania opinion in *Lower Paxon Township*, 557 A.2d at 393. It is this Pennsylvania opinion which the *Koppers* Court cited to when defining "sudden and accidental."

the second and third releases causing water aquifer contamination in either two or six months. *See* Doc. No. 87, Exhibit 15, p. 103. Mr. Lukasik further stated that based on his review of the data, the evidence indicated that "no form of response or remedial measures ha[d] been undertaken which [would] potentially interrupt that sequence of events." *Id.* Thus, while the initial discharge occurred in August or September of 1978, the dispersal or leaching has been continuous thereafter, lasting at least seventeen years. To rule that such continuous pollution is "sudden and accidental" thwarts the policy goals behind the exclusion. It exacerbates the damages, and therefore undermines the goal of mitigation, by promoting the polluter to seek coverage without first addressing the "calamity."

### Conclusion

Application of the "lasting only a short time" requirement to the instant case reinforces the policy goal. While the releases are properly characterized as "sudden and accidental," they did not last only a short time. Thus, the Court holds that Plaintiff's claimed pollution damages are not "sudden and accidental" and therefore are barred by the pollution exclusion clause.

Accordingly, it is **ADJUDGED AND ORDERED** that Defendant Canal Motion for Summary Judgment (Doc. No. 53, filed May 10, 1995) arguing that the contamination was not "sudden and accidental" is **GRANTED.** The Court **DENIES AS MOOT** the other three arguments presented by the Defendant. The Clerk is directed to CLOSE this case and enter judgment in favor of the Defendant.

**DONE AND ORDERED** at Tampa, Florida, this 28th day of July, 1995.